[Cite as *State v. Hawkey*, 2016-Ohio-1292.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

STATE OF OHIO,                                CASE NO. 4-14-03

    PLAINTIFF-APPELLEE,

    v.

JUDITH I. HAWKEY,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Defiance County Common Pleas Court

Trial Court No. 13 CR 11628

Judgment Reversed in Part and Affirmed in Part,
Remanded for Further Proceedings

Date of Decision:  March 28, 2016

APPEARANCES:

    *W. Alex Smith* **for Appellant**

    *Russell R. Herman* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Judith Hawkey ("Hawkey") brings this appeal from the judgment of the Court of Common Pleas of Defiance County finding her guilty of aggravated murder, insurance fraud and child endangering and sentencing her to life in prison without the chance of parole. On appeal, Hawkey challenges the sufficiency of the evidence, the manifest weight of the evidence, and the admission of certain evidence. For the reasons set forth below, the judgment is reversed in part and affirmed in part.

{¶2} On November 3, 2003, Hawkey's husband at the time, Robert Breininger ("Robert") was shot and killed by his then ten year old son Corey Breininger ("Corey"). The shooting was investigated, ruled to be accidental, and the case was closed. Between May 2011 and March 2012, Corey told people that the shooting of his father was not an accident and that he had done it at the instruction of Hawkey. The case was reopened and a new investigation ensued. The investigation resulted in the death being ruled a homicide and charges being filed.

*Procedural History*

{¶3} On March 7, 2013, the Defiance County Grand Jury indicted Hawkey on one count of Aggravated Murder in violation of R.C. 2903.01(A), four counts of Endangering a Child in violation of R.C. 2919.22(B)(2), and one count of

Insurance Fraud in violation of R.C. 2913.47(B)(1). Doc. 1. Hawkey was arraigned on the charges on March 12, 2013, and entered pleas of not guilty to all charges. Doc. 4. On July 30, 2013, Hawkey filed a motion to exclude the expert testimony of Dr. Barbara Knox ("Knox") on the grounds that it was not supported scientifically or medically under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Miller, et al. v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998). Doc. 40. The record does not indicate that the State ever filed a response to this motion. No ruling was made on the motion prior to trial.

{¶4} A jury trial was held from October 28, 2013, to November 8, 2013. At the conclusion of the trial, the jury returned verdicts of guilty as to all counts. Doc. 92-97. A sentencing hearing was held on December 19, 2013. Doc. 80. The trial court sentenced Hawkey to life in prison without the possibility of parole on the aggravated murder charge. *Id.* On the child endangerment charges, Hawkey was sentenced to prison terms of eight years for count two and three years each for counts three, four, and five. *Id.* The trial court sentenced Hawkey to a prison term of three years for the insurance fraud conviction. *Id.* The prison terms for counts two through six were ordered to be served consecutive to each other for a total prison term of twenty years, but concurrent to the life sentence. *Id.* The sentencing entry was filed on December 30, 2013. *Id.*

{¶5} On January 17, 2014, Hawkey filed her notice of appeal. Doc. 106.

Hawkey raises the following assignments of error on appeal.[1]

### First Assignment of Error

**The trial court erred when it accepted the jury's guilty verdict which was clearly against the manifest weight of the evidence and sufficiency of the evidence.**

### Second Assignment of Error

**The trial court erred when it allowed the victim to testify after the close of the State's case in chief and after the Defense had opened their case.**

### Third Assignment of Error

**The trial court erred when it allowed into evidence two critical instances of hearsay without exception.**

### Fourth Assignment of Error

**The trial court abused its discretion when it overruled [Hawkey's] *Daubert* motion and allowed the testimony of the State's expert witness Dr. Knox regarding child torture as a form of child abuse.**

In the interest of clarity, we will address the assignments of error out of order.

Before we can address the assignments of error, the trial testimony must first be

reviewed.

---

[1] This court notes that this opinion only addresses the issues raised in the assignments of error and does not address anything not raised.

*Trial Testimony*

{**¶6**} During the trial, the State presented the testimony of twenty-five witnesses during its case-in-chief. The first was Lacie Miller ("Miller"). Miller was the 9-1-1 operator who took the call from Corey after the shooting. Tr. 407. Miller testified that she told Corey how to perform CPR and that he was counting out the chest thrusts for her. Tr. 408. A recording of the call was played for the jury. On cross-examination, Miller testified that Corey was very emotional and hysterical and told her that he did not know there was a bullet in the gun and his father was shot. Tr. 410. Corey also identified Hawkey as his mother and indicated that she was not home at that time. Tr. 411.

{**¶7**} The second witness for the State was Michael Harris ("Harris") who was an emergency medical technician ("EMT") who responded to the scene. Tr. 414. When he arrived at the scene of the shooting, he saw Corey outside of the house with a deputy, and the boy was crying. Tr. 415. When Harris and the other EMT's went into the bedroom, they saw no sign of life from the victim, so he backed out of the room. Tr. 415. No attempt at CPR or any other life-saving measure was made. Tr. 420. He later saw Hawkey in the ambulance with Corey and recalled Hawkey repeatedly telling Corey to stop crying. Tr. 422. In Harris' opinion, Hawkey was not showing sympathy to Corey. Tr. 423. On cross-examination, Harris testified that at the time of the shooting, he did not believe

Corey's story of the events because it did not match up with the physical evidence he saw. Tr. 430-32. In Harris' opinion, the shooting was at close-range and did not appear accidental. Tr. 436-38.

{¶8} Greg Zimmerman ("Zimmerman") was another EMT that responded to the scene of the shooting. Tr. 440. According to Zimmerman, he was informed that the victim had allegedly been sitting up speaking with Corey when the gun went off. Tr. 441-42. Zimmerman testified that it did not appear that anyone had attempted CPR on the victim, as was claimed by Corey. Tr. 444. Zimmerman testified that he told the officers at the scene that the story told by Corey did not match the evidence at the scene. Tr. 445. Zimmerman also testified that Corey stated that "It feels like it's my fault" which Zimmerman found odd. Tr. 446. When Hawkey arrived, she seemed to be angry. Tr. 446, In Zimmerman's opinion, Corey was upset, but he did not appear to be harmed and he had no blood on him. Tr. 448. On cross-examination, Zimmerman admitted that he did not indicate at the time of the shooting that Hawkey appeared to be angry or lacked sympathy for Corey. Tr. 452.

{¶9} Michelle Potter ("Potter") was another EMT that came to the scene. Tr. 457. She stayed with Corey in the ambulance until Hawkey arrived. Tr. 466. Corey was hysterical and crying at the scene. Tr. 459. She did not recall seeing any blood on Corey and although she had hugged him several times, there was no

blood on her clothing either. Tr. 465. Potter testified that Hawkey was very cold to Corey and when she arrived, Corey appeared to be scared and stopped crying. Tr. 460. The only thing Hawkey said to Corey was "Come on" and Corey left with her immediately. Tr. 460-61. On cross-examination, Potter testified that in the time she was alone with Corey, he did not tell her that he was being abused and she saw no indications of abuse on him. Tr. 469. Potter also admitted that she knew Hawkey from high school and had "a low opinion" of her. Tr. 470.

{¶10} The fifth witness for the State was Angela Reeve ("Reeve"), who was employed in the payroll department of Steel Dynamics where Robert worked. Tr. 473. Reeve testified that Hawkey came into the office the day after Robert's death to complete the beneficiary paperwork. Tr. 475. This surprised Reeve as she did not expect Hawkey so soon. Tr. 475. At that time, Hawkey did not appear visibly upset to Reeve. Tr. 475. Reeve also testified to the benefits received by Hawkey and indicated that the total benefits received were $333,864. Tr. 479. On cross-examination, Reeve testified that Robert had applied for the supplemental policies when he was hired in 2000. Tr. 481. If Robert had lived, he would have earned over $730,000 in the next 10 years, would have had health insurance, stock options, dental coverage, vision coverage, a 401K, and college scholarships for his children. Tr. 483-87. Reeve also testified that Robert had signed all of the forms and Hawkey had no involvement in the process. Tr. 496. Reeve noted that the life

insurance would not have been paid out until an independent investigation into the death was completed. Tr. 485. The forms indicated that Robert had excluded Corey as a beneficiary, instead leaving everything to Hawkey with Garrett Breininger ("Garrett") as the secondary beneficiary. Tr. 497-98.

{¶11} Deputy Kevin Fackler ("Fackler") testified next for the State. On the day of the shooting, Fackler was a deputy for Defiance County and was dispatched to the home. Tr. 501-502. When he arrived on the scene, Corey was on the front porch with Lieutenant Cliff Vandemark ("Vandemark"). Tr. 502. Fackler then went into the bedroom to secure the scene and take pictures. Tr. 503. Fackler testified that he saw Robert lying in a twin bed with blood around his head and that he had earplugs in both ears. Tr. 505-506. Fackler noted that the stippling from the gunpowder indicated a close-range shot. Tr. 507. He also saw various pamphlets about guns lying on the bed, including one lying under the arm of the victim. Tr. 507. The gun was found lying on the floor on the other side of the bed from the injury to Robert's head. Tr. 511. In his opinion, the evidence at the scene indicated that the body had not been moved after being shot. Tr. 510. On cross-examination, Fackler testified that he had interacted with Corey and Hawkey in August of 2001, and saw no indications that Corey was being physically abused. Tr. 520-21. Fackler also interacted with Corey, Hawkey, and Emily Breininger ("Emily") who were all upset about Corey being teased on the bus. Tr.

528. Again, Fackler noted no signs of abuse and Corey did not indicate he was abused or that he had intentionally shot Robert. Tr. 529.

{¶12} Dr. Gary Okuley ("Okuley") testified that he had been the Defiance County Coroner since January of 2013. Tr. 536. After reviewing the crime scene photos, reading the reports, reading the most recent statements made by Corey, and speaking with the former coroner, he changed the manner of death from accidental to homicide. Tr. 537-38. On cross-examination, Okuley admitted that he changed the certificate at the request of the prosecutor and solely based on the new statements made by Corey, even though he had not spoken with Corey. Tr. 542-43.

{¶13} The eighth witness for the State was Ronnie Phlipot ("R. Phlipot"). R. Phlipot testified that he had lived across the street from Corey and his family for a short time. Tr. 554. During that time, he did not see Corey out around the neighborhood with the other children. Tr. 556. When Corey decided to leave Hawkey's home at the age of 18, he came to live with R. Phlipot because he was a friend of R. Phlipot's son. Tr. 554. While there, Corey became emotional and R. Philipot came home one day to find a note that he took to be a suicide note. Tr. 557. R. Phlipot then went looking for Corey and found him "bawling and hysterical". Tr. 559. Corey kept saying "he was going to be with his dad." Tr. 561. R. Phlipot then took him to the hospital to get help. Tr. 561. During the

time he was with Corey, he did not indicate at any time that he had intentionally shot Robert. Tr. 568.

{¶14} Charlene Grant ("Grant") testified that she taught Corey English in his senior year. Tr. 581-82. During that year, he wrote an essay about something that had a profound effect upon him. Tr. 582. When Grant read the paper, she spoke with the guidance counselor, who told her it was being handled. Tr. 583.

{¶15} Lauren Beck ("Beck") was a former teacher of Corey and first met him when he was seven. Tr. 586. When Corey was in first grade, she had concerns because it was hot and he was still wearing long sleeves and pants. Tr. 587. Beck testified that when Corey pulled up his sleeves, his arms were covered in bruises. Tr. 588. Soon after that, he came to school with a black eye. Tr. 588. On another occasion, Corey fell and cracked open his head, and neither Robert nor Hawkey took him to the hospital. Tr. 589. However, Beck did not report her suspicions to the police and did not speak with the parents. Tr. 590. Beck then testified that in March of 2012, Corey told her at a ball game that Hawkey had physically abused him and had forced him to shoot Robert. Tr. 602-608. The next day, she reported the conversation to the guidance counselor. Tr. 613. On cross-examination, Beck admitted that she did not ever report any suspicions of child abuse to Job and Family Services or to law enforcement. Tr. 623. She also admitted that she did not speak to the police for a few days about what Corey told

her, contrary to what she had previously testified. Tr. 615. As Corey's physical education teacher, she never saw any indication that Corey was in pain while participating and testified that he was able to move around easily and was very athletic. Tr. 626. Beck was also unaware that Corey told the police that Beck would do everything she could to make sure Hawkey "got what she deserved." Tr. 636. She testified that she had told Corey that she would help him in any way she could. Tr. 637. Beck also testified that she was unaware that Corey had played soccer, baseball and had been involved in wrestling although he told Beck that Hawkey never let him participate in sports. Tr. 627, 643-45.

{¶16} Robyn Snyder ("Snyder") was Corey's second grade teacher. Tr. 647. Snyder recalled being a little bit concerned about Corey in November of his second grade year, because he had bruises on his face. Tr. 649. Corey gave her an explanation of the bruises so she did not make a formal report. Tr. 652. She was also concerned about Corey because Hawkey mentioned sending him to military school and she thought he was too young. Tr. 650. Snyder also noted that Corey sometimes appeared to be dressed too warm for the weather. Tr. 655. However, on cross-examination Snyder testified that she only saw bruising on Corey that one time. Tr. 658. She had never made a formal report and Corey told her he obtained the bruising by falling out of a tree. Tr. 658. Most of Snyder's notes concerning Corey were about his behavior, not any issues with perceived abuse. Tr. 657, 663.

Although Corey missed 15 days of school that year, Snyder did not note any problems with his attendance. Tr. 667-68.

{¶17} The twelfth witness for the State was Vandemark. Vandemark testified that on the day of the shooting, he was a sergeant and was assigned to investigate the incident. Tr. 671. When he arrived at the home, there were no vehicles in the drive and the front door was locked. Tr. 672. Corey opened the door for him and was extremely emotional. Tr. 673-74. Corey originally started taking him to the back of the house, but Vandemark stopped him and entered the bedroom by the door, where he saw Robert's body. Tr. 674. Vandemark testified that he knew there was nothing to be done for Robert when he saw him. Tr. 675. Vandemark then took Corey out onto the porch, where Corey sat on his lap. Tr. 679. Corey appeared to be devastated and told Vandemark that he had taken the books into the bedroom for Robert to read. When Corey went into the room with the gun, his finger was on the trigger and "it shot." Tr. 680. The EMT's then arrived and Corey went with one of them to the ambulance while he went with the other EMT's. Tr. 680-82. When he saw Hawkey arrive, he went out to meet her. Tr. 682. She was at the ambulance and he heard her tell Corey that everything would be okay. Tr. 683. Vandemark then whispered in Hawkey's ear that Robert was dead. Tr. 683. Hawkey then asked to take Corey away from the scene and Vandemark agreed. Tr. 683. At that time, Vandemark believed what Corey told

him because of how devastated Corey appeared to be at the scene. Tr. 685. While Vandemark was still at the scene, Hawkey returned and he questioned her. Tr. 687. Hawkey told him that Robert worked nights and had gone to bed around noon wearing his earplugs. Tr. 687. According to Hawkey, when she left to go to her mother's that afternoon, Robert was awake, but was still in bed. Tr. 688. Hawkey also told Vandemark that Robert and Corey had been working with the gun and talking about it the night before because they were planning on going hunting. Tr. 688. Vandemark then went to speak with Corey and found him still sobbing and emotional. Tr. 689. No further investigation was done at the time because Vandemark relied upon the statement of Corey as to what had happened. Tr. 691.

{¶18} On March 23, 2012, Vandemark again spoke to Corey who was then telling a different story. Tr. 692. Corey told Vandemark that he had intentionally shot Robert at the direction of Hawkey. Tr. 693. According to Corey, Hawkey told him that Robert had a brain tumor and was dying and wanted to be killed so that the family would have some money. Tr. 693. Corey also reported that he had been abused for years by Hawkey and that she was attempting to poison her new husband. Tr. 693-94. Corey told Vandemark that Hawkey met him at the bus the day of the shooting, told him that the gun was in the laundry room and ordered him to shoot Robert. Tr. 694. Corey then went into the laundry room, retrieved

the gun, entered the bedroom, put the gun inches away from his father's head, and pulled the trigger. Tr. 695. Corey told him that when he realized he had killed his father, he dropped the gun and called 9-1-1 as instructed by Hawkey. Tr. 695. Corey had no explanation for how things got placed on the bed. Tr. 702. Vandemark realized after reviewing the evidence, that Corey could not have performed CPR like he told the operator he was doing. Tr. 705. Based upon all the financial benefits received by Hawkey, Vandemark believed that she had used Corey to kill Robert. Tr. 716.

{¶19} On cross-examination, Vandemark testified that he interviewed Corey regarding molestation claims made by him against his paternal grandmother. Tr. 739. During that time, Corey sat on Hawkey's lap and showed no indication of being afraid of Hawkey. Tr. 740, 743. Vandemark also saw no signs of bruising or any other indicators of physical abuse to Corey at that time. Tr. 743. Vandemark also testified that he overheard Hawkey ask Corey what happened in the ambulance and that Corey repeated the same story told to Vandemark. Tr. 752. Vandemark observed Hawkey trying to comfort Corey and began crying, but tried to compose herself so as to not upset Corey. Tr. 752. When Hawkey returned to the scene, he asked her about prior problems between Robert and Corey. Tr. 760. In 2000, Corey told a teacher that Robert had touched him in a sexual manner. Tr. 760-61. When Vandemark later interviewed Corey,

Corey told him that he had gotten the gun from the closet and repeated the same story he had given earlier. Tr. 764. Corey never indicated he was being abused, that Robert was ill, or that Hawkey had told Corey to kill Robert. Tr. 767-68. Vandemark also did not notice any signs of abuse the evening of the shooting or observe any inappropriate interactions between Corey and Hawkey. Tr. 767. Vandemark also testified that the DNA found on the shell was not linked to Hawkey and that the fingerprint found on the shell was too smudged for identification. Tr. 769. Vandemark also testified that on the original death certificate, the coroner could have indicated that the matter was pending investigation rather than accidental, but everyone was satisfied at that time that it was an accident. Tr. 772. Corey indicated in the initial interview that approximately one month before the shooting Hawkey first told him about Robert's alleged brain cancer. Tr. 774.

{¶20} Vandemark also testified that in the 2012 interview, Corey told him that Hawkey had beaten him his whole life and that some of the beatings were so severe that he lost consciousness. Tr. 775. Corey told him he was beaten all over his body with a belt, was beaten with a belt on his genitals, and that his genitals were burned with a lighter. Tr. 775. According to Corey, these beatings left him covered in bruises. Tr. 775. Corey also told Vandemark that Hawkey had tried to kill him on multiple occasions. Tr. 776. According to Corey, Hawkey told him to

climb up a scaffolding and let go so that he would fall. Tr. 777. Vandemark also testified that Corey told him that on one Halloween, Hawkey threw him in a pond while he was wearing his costume so that he would drown. Tr. 777. Corey told Vandemark that Hawkey was attempting to kill her current husband, Gary Hawkey ("Gary") by putting poison in his coffee and that he had seen her do it. Tr. 778. Vandemark testified that when Hawkey was arrested, she denied all of the allegations of abuse. Tr. 780. Vandemark admitted that there were inconsistencies in the stories that Corey had told him, the FBI, and the doctors. Tr. 783. Additionally, none of Corey's pediatric medical records indicated any type of abuse was occurring. Tr. 779. On three different occasions, the police interacted with Corey and no claim of abuse by Hawkey was made. Tr. 804. Vandemark also admitted that he had been fooled by Corey before when he was a ten year old boy and that Corey was estranged from his family and was very angry with Hawkey in 2012. Tr. 807-808. According to Vandemark, Corey blamed Hawkey for everything and indicated that he wanted Hawkey to pay for what she had done. Tr. 809. As a result of Corey's claims against Hawkey, he was not being prosecuted for any offense related to the shooting of Robert. Tr. 815.

{¶21} On re-direct, Vandemark testified that he believed that Hawkey was attempting to poison Gary. Tr. 821. Vandemark also testified that when Corey called Hawkey, he took her statement that he could meet her where there were

-16-

cameras as an indication that she knew he would be afraid of her. Tr. 824. Vandemark thought her demeanor towards Corey during the phone call was cold because she responded "whatever" when he mentioned suicide. Tr. 825. On re-cross-examination, Vandemark admitted that the toxicology screens on Gary came back negative. Vandemark admitted that Hawkey's cold demeanor to Corey during the phone call was not to the question of whether he should commit suicide, but whether he should seek counseling and she responded that he should do whatever he wanted. Tr. 842.

{¶22} The next witness for the State was Tara Thomas ("Thomas"), the former neighbor of Hawkey and Robert. Tr. 861. Thomas testified that she was very familiar with the family and did not like them because Hawkey used vulgar language. Tr. 862-64. On the day of the shooting, she saw Hawkey meet Corey when he got off the bus, put her arm around him in an affectionate manner, and speak to him while they were walking towards the house. Tr. 867. She found this unusual because she did not recall Hawkey showing Corey affection any other time and Thomas did not think it was right that Corey was required to shovel the drive in the winter before he went to school. Tr. 867. On cross-examination, she admitted that the two families did not get along and that there were police reports regarding disputes between her children and Corey. Tr. 870, 874. Thomas also

testified that she did not recall seeing Emily get off the bus when she saw Corey. Tr. 872.

{¶23} Knox was the fourteenth witness for the State. She testified that she is a Board Certified Child Abuse Pediatrician. Tr. 892. She then proceeded to testify that Corey was a victim of child torture. Knox defined "child torture" as "an extreme form of child abuse that includes multiple elements of abuse; physical abuse, psychological abuse with – in more than one form, and many times neglect." Tr. 905. Before interviewing Corey on February 19, 2013, Knox reviewed all the records sent to her by the State. Tr. 908-909. Corey told Knox that he was very threatened by Hawkey from the time he met her because "she would consistently hit him with objects, such as belts, such as, umm, other implements, and she would also hit him with her hand, both open-handed and closed fist, and then also isolate him for hours on a porch that – that she had." Tr. 911-12. Corey told Knox that prior to him entering the second grade, Hawkey would hit him all over, but switched to beating his genitals and burning them after teachers started asking questions. Tr. 913. Knox testified that Corey told her the abuse continued until he left the home at the age of eighteen. Tr. 914. Corey also reported to Knox that Hawkey would require him to stand in static positions for hours and would beat him if he broke the position. Tr. 914. Knox testified that Corey was psychologically abused by being constantly degraded, humiliated,

requiring him to do all the chores, giving him fewer rewards, and isolating him. Tr. 916. Corey also reported to Knox that Hawkey required him to eat his own feces, spread his feces on himself, and to eat dog feces. Tr. 917. Corey reported that Hawkey told him that if he did not kill Robert, Hawkey would kill Corey. Tr. 918.

{¶24} Knox testified that Corey reported to her that Hawkey on one occasion told Corey to climb up scaffolding and then let go. Tr. 919. Corey claimed to have done as he was told, even though Hawkey was not there at the time because he wished to die. Tr. 919. This resulted in Corey having to be airlifted to a Level 2 Trauma Center. Tr. 919. Corey also reported that Hawkey had cut him above his penis with a butter knife, and a physical exam showed a small scar in that area. Tr. 921, 926. Corey claimed to Knox that Hawkey was always threatening to publicly humiliate him, called him "gay", and called him a girl. Tr. 919. Hawkey had a picture of Corey and Garrett in dresses and threatened to show the picture to Corey's friends. Tr. 919-20. Knox also testified that Hawkey was abusive for not seeking counseling for Corey after Robert's death because Hawkey was "not going to spend that money." Tr. 945. In Knox's opinion, Hawkey staged videos of Corey acting strange in order to isolate him from Robert, which Knox believed to be a form of psychological abuse. Tr. 938-

49.  Knox also testified that Corey told her that he had a dog that he believed Hawkey had killed by poisoning it.  Tr. 952.

{¶25} On cross-examination, Knox admitted that there was no scientifically accepted definition of child torture and it was merely an idea that she had which had yet to be formally accepted by the medical community.  Tr. 981.  Knox also admitted that she is not a psychologist or a psychiatrist and had not reviewed all of the medical records from when Corey was a child.  Tr. 962, 985.  According to Knox, she was hired by the prosecutor to investigate the case, and she never has testified for defendants, only the State.  Tr. 988-89.  Additionally, she referred the prosecutor to the psychologist who was hired by the State to testify in this case.  Tr. 989.

{¶26} Concerning the fall from the scaffolding, Knox acknowledged that this occurred prior to Robert's death and at a time when Corey alleged to being beaten severely on a daily basis.  Tr. 997.  Yet the medical exams after the fall showed nothing unusual, including no injuries or bruising except what would be expected from the fall.  Tr. 998-1016.  Corey also alleged that he was only given minimal food, yet the medical reports indicate no questions concerning starvation or malnutrition.  Tr. 1013.  Corey was alone at the hospital and reported that he had kicked a ball, which got stuck on the scaffolding and he had climbed up to get it when he fell.  Tr. 1016-17.  Additionally, although Corey claimed that Hawkey

removed him from the hospital against medical advice, the reports indicate that everything was normal, the family was supportive and attentive, and it was safe to take him home. Tr. 1020-21. A specific exam of the genitals showed no indication of any bruising or burns, despite Corey's claim that he was being beaten there by a belt on a daily basis. Tr. 1019. The x-rays also showed no indication of abuse. Tr. 1023. Follow-up exams from the fall were done for the next month. During all of those exams, there were no indications that any abuse was occurring although Corey claimed that he was still being beaten on a daily basis. Tr. 1027-29. Additionally, Corey was taken to the doctor for various injuries and illnesses over the years. Knox testified that all of the records contain no information which would indicate that any physical abuse was occurring and Corey did not report it. Tr. 1030-34.

{¶27} Knox testified that in 2011, Corey was hospitalized for psychiatric reasons. Tr. 1036. At that time, a full physical exam was conducted and Corey was questioned extensively concerning his mental health. Corey reported to those doctors that his father had been accidentally shot. Tr. 1037, Ex. C. The report indicated that Corey reported to the doctors that Hawkey had been physically and mentally abusive, but was evasive when questioned. Ex. C. Knox admitted that during his hospitalization for depression, Corey repeatedly told the doctors that he had accidentally shot Robert. Tr. 1040. The physical exam prior to his admission

revealed no signs of abuse. Tr. 1042-43. Knox admitted that in all of the medical records, there were no physical signs of abuse other than the one scar above his penis and the origin of that could have other causes than the one given by Corey. Tr. 1045-69. Knox determined that Corey's statements were believable because they were "complex". Tr. 1114.

{¶28} On redirect, Knox testified that Corey missed more school while living with Hawkey than he missed during the year he lived with his grandparents. Tr. 1118-20. She also testified that psychological abuse leaves mental scars, but not visible ones. Tr. 1133. However, Knox admitted on re-cross-examination that the claims of psychological abuse are solely based upon statements of Corey with no evidence to corroborate them. Tr. 1137.

{¶29} Catherine Connell ("Connell") testified that she was employed as a child and adolescent forensic interviewer for the FBI. Tr. 1157. She interviewed Corey on October 17, 2012. Tr. 1167. According to Connell, Corey's interview disclosures to her were generally consistent with his prior statements to other interviewers. Tr. 1172.

{¶30} On cross-examination, Connell admitted that Corey did not disclose any sexual abuse by his grandparents, being forced to eat feces, being choked until he passed out, or being forced to take cold baths during his interview with her. Tr. 1174-79. Corey also claimed that the incident in which Hawkey cut him with a

butter knife was an accident because she only meant to scare him, not to actually cut him. Tr. 1183. Corey's statements to her were that Hawkey had gone to the scaffolding with him and told him to jump while she was there. Tr. 1190. Corey also told her that he did not have a bedroom and was forced to sleep in the laundry room or a closet. Tr. 1190. According to Connell, Corey was very sure that Hawkey first mentioned that Robert had brain cancer three days before the shooting. Tr. 1192. During her interview with Corey, he indicated that Hawkey was trying to kill Gary by putting poison in his coffee, though he admitted he had not seen her do so. Tr. 1194-95. Corey claimed that he did not like Emily because she was mean to him. Tr. 1196. Corey also alleged that Hawkey forced him to stand outside in little or no clothing and that he had been deprived of food. Tr. 1199.

{¶31} The sixteenth witness for the State was James Hardie ("Hardie"), a Supervisory Special Agent for the FBI in the violent crimes against children section. Tr. 1220. Hardie testified that the crime scene photos appeared to have been staged. Tr. 1227-29. He also was convinced that Corey was afraid of Hawkey and Hawkey's knowledge of that, in his opinion, was evidence that Corey had reason to be afraid of her. Tr. 1233. During the course of his investigation, he became concerned about Gary's safety, so the decision was made to arrest Hawkey. Tr. 1241. On cross-examination, the witness admitted that any police

reports that existed showing contact between Corey and law enforcement had no indication that Corey was being physically abused.[2]  Tr. 1253.  Hardie also admitted that Hawkey had denied abusing Corey in any way during his interview.  Tr. 1261.  However, he testified that Corey's statements were credible because he was taking responsibility and had asked if he would be going to jail for shooting Robert.  Tr. 1256.

{¶32} Kristi Phlipot ("K. Phlipot") testified that Corey came to live with her family when he left home.  Tr. 1304.  When she lived across the street from Hawkey, she found her unpleasant and did not like how she wanted the children to always work instead of playing.  Tr. 1307.  K. Phlipot recounted how Corey became very upset one time when Hawkey came to pick him up.  Tr. 1308-1309.  In the summer of 2011, her husband found what they took to be a suicide note written by Corey, so they took him to the Coping Center and he moved out soon after he left the hospital.  Tr. 1310-15.

{¶33} Lisa Nusbaum ("Nusbaum") testified that she was Corey's fifth grade teacher.  Tr. 1317.  She recalled Corey wearing long sleeves and jeans a lot, but never had any concerns about his well-being.  Tr. 1318.  Hawkey told her that the shooting was caused by the dog running by and knocking the loaded gun.  Tr.

---

[2] The witness was very evasive during cross-examination and did not wish to confirm that there had been instances where the police had contact with Corey and Hawkey after the shooting and had seen no signs of abuse, even though the officers had filed reports and had testified to such.

1319. On cross-examination, Nusbaum testified that she never saw any marks on Corey. Tr. 1325. She also admitted that Hawkey could have been telling that story to take the focus off of Corey. Tr. 1327.

{¶34} Sherry Bell ("Bell"), Corey's maternal grandmother was the nineteenth witness for the State. Tr. 1333. Bell testified that she did not see Corey as a toddler when her daughter had custody of him. Tr. 1334. However, when Robert married Hawkey, Robert asked her to let Corey stay with her and her husband because Corey was upsetting the family. Tr. 1335. Corey lived with her for a year, and during that time, neither Robert nor Hawkey made contact with Corey. Tr. 1336. Later, Corey returned to live with Robert and Hawkey before coming back to Bell's house for another year. Tr. 1337-38. Bell testified that it was only in the last couple of years that she had renewed her relationship with Corey. Tr. 1344.

{¶35} Mark Rebber ("Rebber") testified that he dated Hawkey in 2008 and allowed Hawkey and the children to live with him for a couple of weeks when she was having financial issues. Tr. 1357-59. Hawkey told him that Robert died when Corey tripped over the gun and it accidentally fired. Tr. 1358. While they lived at his home, Corey was the one who was always doing work. Tr. 1360. In his opinion, Hawkey was verbally abusive to Corey. Tr. 1362. According to Rebber, Emily was always at her grandmother's home, Garrett was with Judy all

the time, and Corey did the work. Tr. 1364. However, on cross-examination, he admitted that they only lived together for a couple of weeks and that he never saw Hawkey be physically abusive towards Corey. Tr. 1364.

{¶36} Wendy Forester ("Forester") testified that she was an acquaintance of Robert and Hawkey because they lived near each other and had children near the same ages. Tr. 1368. The day that Corey fell from the scaffolding, Hawkey came to her house asking for help in finding Corey. Tr. 1371. Before Forester could help, Hawkey came back and said he had been found, but had fallen. Tr. 1371. On cross-examination, Forester testified that she, Hawkey, and the children interacted frequently. Tr. 1373. Hawkey was very excited to adopt Corey and treated all the children the same. Tr. 1374. Forester's children played with Hawkey's children, both in the houses and outside. Tr. 1374. Forester never saw any sign of bruises or marks on Corey. Tr. 1375. Forester observed Robert spending time with each of the children individually, including Corey, when he was home. Tr. 1377. After Robert's death, Hawkey was hysterical and was afraid that Corey would be blamed for the shooting. Tr. 1376. Forester testified that Hawkey was surprised at the amount of insurance money she received, but had always been a spender, so bought stuff for the children. Tr. 1380-81. All three children received four-wheelers and mini-bikes. Tr. 1381. Forester also testified that both Emily and Corey were required to do chores around the house with only

Garrett not doing much because of his young age. Tr. 1382-83. At no time did Forester ever see Hawkey be physically abusive towards Corey. Tr. 1383.

{¶37} The next witness was Joe Woodbury ("Woodbury"), who dated Hawkey for three or four years "off and on." Tr. 1392. According to Woodbury, Corey did what Hawkey said without arguing. Tr. 1393. Hawkey told him that Robert had been shot when a dog knocked the gun over and it went off. Tr. 1394. Woodbury also testified that Hawkey had bought a car for Corey and there was a dispute when Hawkey wanted to sell the car and Corey did not. Tr. 1396.

{¶38} Robert Zeedyk ("Zeedyk") testified that before Robert died, Hawkey would stop by with the children after school, but Corey was not allowed to play with toy guns because she did not want him to play with guns. Tr. 1403. Zeedyk testified that he once heard Hawkey state that if anything happened to Robert, she and Emily would be wealthy, but she did not mention Corey. Tr. 1406.

{¶39} Dr. Ann Salter ("Salter") testified that she is a clinical psychologist with a master's in child studies who interviewed Corey at the request of the State. Tr. 1428, 1439-40. During the interview, she was not concerned with using leading questions because Corey had already been interviewed multiple times. Tr. 1445. She tested Corey for psychopathy, but did not find any issues. Tr. 1462. She diagnosed Corey with post-traumatic stress disorder and determined that he feels detached from other people, has issues trusting women and sustaining loving

feelings towards them, and has issues with hypervigilance and reckless behavior.[3] Tr. 1466-72. Salter testified that her diagnosis was based upon what Corey told her and what he had told the other interviewers. Corey told her that Hawkey made him eat feces and rub them on himself. Tr. 1489. Corey also claimed that he was isolated and treated as a slave. Tr. 1493. Based upon the abuse claimed by Corey, Salter determined that Corey had been traumatized and testified that traumatized children are one of the category of children that are known to kill parents. Tr. 1495-96. In Salter's opinion, there was no reason for Corey to kill Robert other than Hawkey telling him to do so. Tr. 1497.

{¶40} On cross-examination, Salter testified that she did not treat people or provide therapy for anyone. Tr. 1502. Her specialty was researching sexual abuse and violent crimes. Tr. 1505. Prior to reaching her conclusions, she did not review any medical records, so believed Corey when he told her that Hawkey had taken him from the hospital against medical advice, when the records show that was incorrect. Tr. 1518-21. Salter admitted that when Corey was hospitalized for suicidal tendencies, he was specifically screened for post-traumatic stress disorder and it was determined he did not suffer from it. Tr. 1528-31. She also admitted that Corey tested normal on the test she used for functioning after trauma. Tr. 1527. Although Corey told her that he had tried to commit suicide several times,

---

[3] The determination of reckless behavior was based upon Corey's riding a Harley Davidson without a helmet and working at a metal factory where he sometimes gets burned.

he was evasive as to details and there was no verification of any suicidal thoughts or attempts other than the one hospitalization. Tr. 1534-37. She did not have Corey complete the MMPI-II test used to identify personality structure and psychopathology, instead choosing to rely upon a psychopathy test that was based upon her subjective opinion as to the evidence. Tr. 1544-47. Although Corey told her that the abuse was daily, the only physical evidence was one scar. Tr. 1549-53. Salter testified that Corey told her that he slept in the laundry room and did not have a bedroom until after Robert died. Tr. 1561. Yet, video and photo evidence shows that Corey did have a bedroom. Tr. 1562. Corey claimed to have been isolated and starved, yet all the contemporaneous written records do not corroborate those claims. Tr. 1564. Corey also claimed to not be allowed to sleep for extended periods of time, yet the school records do not indicate there were any issues with Corey falling asleep in school. Tr. 1565. Corey also reported to Salter that as a child, Hawkey, Robert, and the other children would go away for the weekend and leave him home alone to do chores. Tr. 1586. According to Salter, Corey indicated that on the day of the shooting, Hawkey grabbed him by the neck when he got off the bus, but the neighbor who witnessed it reported that Hawkey put her arm around him. Tr. 1588-90. Corey also told Salter that while he was sitting in the ambulance he was alone with Hawkey and she told him what to say. Tr. 1593. Salter admitted that Corey did not indicate that there was an EMT

and/or a deputy with him at all times and they did not corroborate Corey's memory. Tr. 1593. Salter admitted that Corey had psychological problems and that his judgment had been impaired at times. Tr. 1595.

{¶41} Following Salter's testimony, the State rested their case except for the discussion of the admission of exhibits.[4] Hawkey then presented her first witness. Dr. Stephen Guertin ("Guertin") testified that he is a board certified pediatrician who operates a child abuse clinic and has done so for approximately 30 years. Tr. 1627-30. Guertin testified that he is frequently called by police and other hospitals when abuse is suspected and that he trains new doctors on how to recognize cases of abuse. Tr. 1630. According to Guertin, there is no medically recognized category of abuse called "child torture", it is just child abuse. Tr. 1636. After reviewing all of the medical records provided for Corey, Guertin determined that there were no indications of physical abuse. Tr. 1639. If the abuse were happening as frequently as claimed by Corey, then the records should reflect something to substantiate the allegations. Tr. 1640. Guertin testified that if Corey's genitals were beaten with a belt as claimed, one would expect to see swelling, difficulty urinating, and bruising that would last for weeks. Tr. 1642. The medical records never indicated any sign of physical abuse that should have been evident if there were beatings of the nature and extent claimed by Corey. Tr.

---

[4] At that time, the State had no intention of calling Corey to testify.

1646-58. Guertin also testified that Corey could not have been chronically starved and been in the 50th percentile for weight and body mass as shown by the medical records. Tr. 1655-56. As to the scar above the penis, Guertin testified that it could have been caused by many different sources and indicated that the specific injury suffered could have been from a toilet seat injury. Tr. 1667-70. A review of the x-rays indicated that Corey had not had broken bones because even after it heals, the x-ray will reveal former broken bones due to slight deformities in the structure that remain. Tr. 1671. Although Corey did not receive yearly physicals and there were gaps in his medical history, the growth parameters of the records and the pictures taken do not indicate a child who was chronically starved as claimed by Corey. Tr. 1672. Guertin also testified that Corey was not taken out of the hospital against medical advice after the fall from the scaffold because that would have been well documented in the record for liability purposes, and nothing was included. Tr. 1695. On cross-examination, Guertin admitted that it was possible that Corey had been abused over the years and had never reported it to any of the medical professionals that he saw. Tr. 1678-92.

{¶42} Before Hawkey called her next witness, the State proceeded to have its exhibits admitted. Upon learning that some of the exhibits would not be admissible because they were hearsay, the State determined that it would like to reopen its case and call Corey to testify. The trial court permitted the State to do

so, and Corey then took the stand. Corey testified that when he was little, he lived with his father and paternal grandmother. Tr. 1764. He then moved to Indiana to live with his maternal grandparents while he attended kindergarten. Tr. 1766. After kindergarten, he returned to Ohio to live with his father, Robert, and Hawkey, who had married Robert. Tr. 1767. Corey testified that Hawkey did not want him to have contact with Robert and did not want Corey to be a part of the family. Tr. 1768-69. The relationship between Hawkey and Corey was not good in Corey's opinion, and he testified that there was physical, emotional, and mental abuse. Tr. 1770. Corey testified that Hawkey once put a butter knife above his penis, told him he was going to become a girl, and accidentally cut him. Tr. 1771. Hawkey made him dress up like a girl at times. Tr. 1772. On other occasions, Hawkey forced him to lie in a tub of ice water or forced him to eat dog food and dog fecal matter. Tr. 1773-74. Corey believed that Hawkey had attempted to make Robert think that Corey was crazy. Tr. 1775. Corey testified that Hawkey would pull on his genitals and would burn them with a lighter. Tr. 1775. According to Corey, the abuse happened on a "pretty regular basis" as a form of punishment. Tr. 1776.

{¶43} On the day of the shooting, Hawkey met Corey at the bus and told him he was to shoot Robert that day. Tr. 1778. Corey testified that Hawkey had left the loaded gun in the laundry room and told him how to set the scene

afterwards. Tr. 1779. Hawkey had told him that Robert had brain cancer and wanted Corey to do this so that the family would be taken care of financially. Tr. 1778-79. When Hawkey left with Emily and Garrett, Corey went into the house and saw the gun in the laundry room. Tr. 1781. Corey testified that he took the magazines into the bedroom and put them around Robert on the bed. Tr. 1782. Corey then pointed the gun at Robert, but it did not fire. Tr. 1783. Corey then realized that he had to cock the gun, so he went back into the bedroom, put the gun near Robert's head, and pulled the trigger, firing the gun. Tr. 1783-84. Corey testified that he had no choice but to shoot Robert because Hawkey threatened to kill him if he did not do so. Tr. 1785. After Corey shot Robert, he called 9-1-1. Tr. 1788. The operator told him how to perform CPR and Corey told her he was doing so, but he did not attempt it. Tr. 1790-91. When the deputy arrived, he told him the story that Hawkey had previously told him to tell. Tr. 1952.

{¶44} Corey testified that he had never told anyone about the shooting or the abuse because he was afraid. Tr. 1794. Corey testified that he wrote a paper about the abuse, but the teacher did not read it. Tr. 1795. Corey testified that he first told about the abuse when he thought about committing suicide, but that he still did not tell about the shooting. Tr. 1798. Corey also testified that when he was a child and anyone questioned him about the bruises, he just stated that he fell. Tr. 1799. When too many questions were asked, Hawkey switched from

-33-

beating him everywhere to beating, grabbing and burning his genitals. Tr. 1799. Corey testified that before Robert's death, Hawkey told him to climb up the scaffolding and let go so that he would fall and likely die. Tr. 1801. He did not recall how he actually fell. Tr. 1805. According to Corey, Hawkey did not allow him to play sports and she did not put him in counseling after the shooting. Tr. 1810-1813. Although Hawkey had bought him a car, she later sold it. Tr. 1815.

{¶45} On cross-examination, Corey testified that although he was alone with Vandemark, he told him the shooting was an accident. Tr. 1820. He also told the doctors at the hospital in 2011 that the shooting was an accident. Tr. 1822. In 2012, Corey told Vandemark that Hawkey had told him Robert had brain cancer a month before the shooting. Tr. 1823. Corey admitted that he had lied to the deputy at that time, because it was only a couple days before the shooting that Hawkey had mentioned cancer. Tr. 1825. Corey also admitted telling interviewers that he had been beaten his entire life every day with various items, including hammers, pans, shovels, belts, flyswatters, brooms, rolling pins, and hands and that these beatings left him covered in bruises. Tr. 1826-27. However, he told Salter that the beatings occurred a couple of times a day. Tr. 1828. He also claimed that his genitals were beaten with a belt and burned by a lighter on a daily basis until he moved out of the house. Tr. 1829. Corey had no explanation as to why no injuries from these daily beatings were ever noted upon medical

examinations. Tr. 1831. Corey admitted that although he claimed he did not play sports because Hawkey would not let him, he did not participate in sports after he moved out either. Tr. 1833. Corey also admitted that he missed as much school after he moved out of Hawkey's home as he did when he lived with her and claimed she was the one keeping him out of school. Tr. 1835. Corey testified that prior to the shooting he was starved, was not allowed to eat with the family, and was only allowed to eat and sleep in the laundry room. Tr. 1837-38. However, when he was alone with Robert, Corey did not ever bring anything up to him. Tr. 1838-39. Corey admitted that his statements to the various interviewers contained some inconsistencies, including telling one interviewer that he was not permitted to go to Robert's funeral when he did go. Tr. 1840-48. Corey testified that Hawkey was alone with him in the ambulance and told him what to say, but had no explanation as to why the EMT's and Vandemark testified that someone was with Corey at all times until he left the scene. Tr. 1851-52. Corey admitted that he told Salter that he would have told the police that the shooting was not an accident if he had ever been alone with them, but he had not done so despite having the opportunities. Tr. 1853. Corey also admitted that he had told Vandemark that he had seen Hawkey put what he thought was poison in Gary's coffee, but he had not really seen it. Tr. 1857. Although Corey told Salter that he was never allowed to have fun and had always been left behind to do chores while

the others were gone, he identified pictures of himself at Chuck E. Cheese, Sea World, the county fair, water parks, the race track in Indianapolis, various zoos, and Cedar Point. Tr. 1859-63.

{¶46} At this point in the trial, the State concluded its presentation of evidence for a second time, and Hawkey continued the presentation of her witnesses. The second witness for Hawkey was Dr. Phillip Esplin ("Esplin"), who was a psychologist who specialized in forensic questioning of children who were victims of crimes. Tr. 1921-22. Esplin testified that forensic interviews are conducted for the purpose of investigation, not treatment and thus must be handled more carefully to avoid suggesting events to the subject. Tr. 1928. Esplin testified that memories based upon traumatic events are reconstructive in nature, so are more subject to influence and more prone to error. Tr. 1939. When one conducts a forensic interview, the interviewer needs to look for facts that confirm the situation as well as facts that contradict the memory because independent records are more reliable than a witness' memory after a decade of time has passed. Tr. 1940. According to Esplin, the memory over time is subject to postdiction, which makes them more prone to error. Tr. 1941. Based upon his review of the records, as he was not able to meet with Corey, Esplin concluded that Corey's life was chaotic and stressful. Tr. 1936, 1942. "[Esplin] had concerns about how reliable the boy's present beliefs may be relative to historical

events, so felt that there should be a concentration on attempting some corroboration, or relying, increasing reliance on corroboration." Tr. 1942. The records indicated that Corey's self-report did not correspond with the written records and that they varied over time. Tr. 1943. Esplin pointed to Corey's statement to Salter that Hawkey removed him from the hospital against medical advice when the records specifically indicated that he was fine and that the family was supportive and cooperative. Tr. 1944. Esplin also pointed to Corey's statement that the beatings intensified after he won a student of the month award at school, but the records show that he did not win the award, but that Emily had won a student of the week award. Tr. 1945. Esplin was also concerned about Salter's diagnosis of post-traumatic stress disorder based upon a subjective test when he was screened by a psychiatrist for the disorder using a specialized screening tool that ruled it out and there were no significant elevations in the screening tool used by Salter. Tr. 1946-47. Another issue that struck Esplin was Corey's claim of the severity of the abuse although he was allowed to have a great deal of contact outside the home, which would be unusual in situations described by Corey. Tr. 1948. According to Esplin, the written records contemporaneous to the time frame of the alleged abuse along with the missing suspicions from mandatory reporters do not corroborate Corey's claim of severe abuse. Tr. 1948-55. The written records also did not corroborate Corey's claims of attempted isolation. Tr. 1949.

Esplin was concerned that Salter used a clinical interview format rather than a forensic one because she used suggestive questions. Tr. 1957-58. "[T]he more you interview an alleged victim, the more risk you'll have – you're going to have of getting inaccurate information, so you want to be increasingly careful * * *." Tr. 1958. Additionally, Esplin testified that when he read Corey's repeated statements, it reminded him of a book called "A Child Called 'It'" due to the similarities. Tr. 1961. Esplin testified that the book had been very popular and described a boy who was treated like a slave by his mother, was tortured, and was forced to suffer horrible and unusual treatment. Tr. 1962.

{¶47} Esplin then compared the claims of Corey to those in the book. Both had the mother as the source of extreme abuse. Tr. 1965. Both the book and Corey stated that the daily abuse started at age four and progressed in severity. Tr. 1966. The book talked about the boy being forced to stand in one place for long periods of time and suffering severe physical abuse if he did not do so. Tr. 1967. Corey told interviewers that Hawkey would require him to be in forced position holds for hours and he would be severely beaten if he broke position. Tr. 1967. The book talked about the boy being thrown about the room and into objects. Tr. 1968-69. Corey claimed the same. Tr. 1969. In the book, the victim claimed to have been burned and made to lie above flames. Tr. 1969. Corey claimed that Hawkey burned him with the flame from a lighter. Tr. 1969. In the book, the

mother made up incidents of misbehavior about the son to report to the father. Tr. 1971. Corey told interviewers that Hawkey created scenarios to make his father think he was a bad child or crazy. Tr. 1971. The victim in the book was only given his sibling's leftovers to eat. Tr. 1972. Corey claimed that he usually only got to eat whatever was left over from Emily and Garrett. Tr. 1972. The victim in the book claimed to have been accidentally stabbed in the kitchen. Tr. 1972-73. Corey claimed to have been accidentally cut by Hawkey in the bathroom, though claimed it was in the kitchen in one interview. Tr. 1972-73. In both the book and Corey's statements, the mother was the person in charge of all discipline. Tr. 1973. The victim in the book claimed to be made to do chores all day. Tr. 1974. Corey made the same claim. Tr. 1974. In the book, the victim was punished for sitting or lying down. Tr. 1974-75. Corey claimed that he was punished if he sat down or fell asleep while being in a forced position hold. Tr. 1975. The victim in the book and Corey both claim to be treated like a slave. Tr. 1975. In the book, the victim claimed to have been forced to eat feces and rub them on his body. Tr. 1975. Corey made the same claim. Tr. 1975. The book victim reported having to resort to eating scraps from the dog's bowl. Tr. 1976. Corey likewise claimed to have eaten the scraps from the dog's bowl and the dog food. Tr. 1976. Both the victim in the book and Corey claimed to be isolated while the family ate meals. Tr. 1976. The victim in the book was made to sleep in the garage, and was forced

to toilet there. Tr. 1977. Corey claimed to be made to sleep in the laundry room and to toilet there when denied access to a bathroom. Tr. 1977. The victim in the book reported losing consciousness from severe abuse and being revived by his mother only to have the abuse continue. Tr. 1978. Corey claimed to have been choked or beaten until he passed out and then revived by Hawkey to have the abuse continue. Tr. 1978. The victim in the book had no self-respect and was sometimes kept out of school. Tr. 1979. Corey reported the same. Tr. 1979. The mother in the book dreamed up new and hideous forms of punishment and torture, while Corey claimed that Hawkey invented new ways to inflict pain. Tr. 1980. In the book, the victim referred to his siblings as his mother's little Nazis. Tr. 1980-81. Corey stated that Emily was just like Judy. Tr. 1980-81. Both the victim in the book and Corey claimed to have been threatened with death by their mothers. Tr. 1981. In the book, the victim claims to have been starved for up to ten days without food. Tr. 1981. Corey claimed to have been denied food or water for days at a time. Tr. 1981. Both Corey and the victim in the book claimed to have needed to sneak food and to be punished if caught. Tr. 1982. The victim in the book claimed to have been made to stay home during family trips. Tr. 1982. Corey claimed that Judy and Robert would take the other kids on trips and leave him home alone to do chores. Tr. 1982. Both Corey and the victim in the book claimed to have been isolated outdoors for hours. Tr. 1982-83. The victim in the

book claimed to be forced into a cold bath for hours and that his head was forced underwater. Tr. 1983. Corey made the same claim. Tr. 1983. In the book, the victim claimed to have been hit with a broom. Tr. 1984. Corey also claimed to be hit with a broom along with many other implements. Tr. 1984. The victim in the book and Corey both claim that they were denied access to their fathers. Tr. 1984. The victim in the book claimed that his mother made his life miserable and brainwashed siblings. Tr. 1984-85. Corey stated that Hawkey made his life miserable and that he was afraid she had brainwashed Garrett into hating him. Tr. 1984-85. The victim in the book and Corey both claim they were not allowed friends. Tr. 1985. In the book, the victim claimed his mother told him to jump off a boat so he would drown, but he did not do so. Tr. 1985. Corey claimed that he was told to jump into a pond wearing his Halloween costume so that he would drown, but that he did not do it. Tr. 1985. The book victim was not allowed to do well in school. Tr. 1986. Corey told Salter that he was not allowed to get good grades and that he was beaten when he was awarded student of the month. Tr. 1986. Both the victim in the book and Corey claimed to have been choked and that they were lucky to be alive. Tr. 1986-87. Both claimed to have been called names by their mother and to have received few or no Christmas presents when growing up. Tr. 1987. In Esplin's opinion, there were striking similarities between the book and Corey's allegations. Tr. 1989-90.

{¶48} On cross-examination, Esplin testified that he was paid $400 an hour for document review and $4,000 a day for work. Tr. 1992. Although Esplin has testified for the State in some cases, he usually testifies for the defense. Tr. 2025. Esplin admitted that if Corey had never read the book, the connection would be irrelevant. Tr. 2052. However, the type of abuse in the book is statistically unusual. Tr. 2054.

{¶49} The next witness for Hawkey was JoEllen Culberson who was the school librarian for Central Local Schools when Corey was a student there. Tr. 2065. She testified that the school library had multiple copies of "A Child Called 'It'" and that it was a popular book amongst the students. Tr. 28.

{¶50} Sharon Schock ("Schock") testified that she was the social worker who completed the homestudy for Hawkey and Robert when Hawkey adopted Corey in 2001. Tr. 2073-76. At the time of the homestudy, Corey had been in the home for years. Tr. 2079. Schock testified that she had training as a child abuse investigator and saw no indications of physical abuse, neglect or malnutrition when she conducted the home study. Tr. 2080. The children in the home were clean, had beds, attended school, and received affection. Tr. 2080. Schock testified that she found Corey to be in good health on a physical, emotional, and mental level. Tr. 2080. She observed positive interactions between Corey and Hawkey as well as between Corey, Emily and Garrett. Tr. 2080-82. Schock

testified that she had spoken to the principal at Corey's school, who was listed as a reference, and he recommended the adoption. Tr. 2089. Likewise, Corey's first grade teacher recommended the adoption. Tr. 2089. A neighbor told her that Corey was given lots of attention by Hawkey and recommended the adoption as well. Tr. 2090. When Schock met Corey, he appeared happy about the adoption and she saw no indication that Corey was afraid of Hawkey. Tr. 2090-91. On cross-examination, Schock admitted that the visit was prescheduled and her knowledge was based upon information from the family. Tr. 2099, 2108-11. However, she indicated on redirect that if she would have seen signs of abuse, she would have noted it and would not have approved the home study. Tr. 2114.

{¶51} The fifth witness for Hawkey was Emily. Emily testified that she never saw Corey being abused by Hawkey. Tr. 2127. On the day that Corey left, Judy was upset. Tr. 2129. Emily testified that before he left, Corey told Judy "I'm going to pin this on you, you b***h. He said, I hate you, you're going to pay for this." Tr. 2129. Emily then suspected that Corey was going to blame Hawkey for killing Robert. Tr. 2130. Emily also testified that on one instance she saw Corey walking back to the house with Robert and he was bleeding near the waistband of his pants. Tr. 2132. Robert and Corey did not tell her what happened, but she saw blood on Corey's underwear near the waistband of his pants. Tr. 2133. Emily claimed that she had seen Corey with a copy of the book

"A Child Called 'It'". Tr. 2134. She admitted that she and Corey sometimes skipped school by telling Hawkey that they were sick and she would just let them stay home. Tr. 2134-35.

{¶52} Emily testified that on the day of the shooting, she got off the bus with Corey and they were met by Hawkey. Tr. 2136. Emily claimed that Hawkey put her arms around both of them and they talked on the way to the house. Tr. 2136. When they got to the house, they had to go to her grandmother's house, but Corey refused to go. Tr. 2137. Hawkey then took Emily and Garret and they left Corey behind with Robert, who was sleeping. Tr. 2137. Emily denied that Hawkey ever told Corey to kill Robert while they were walking from the bus. Tr. 2137. While at her grandmother's house, Hawkey received a call and was devastated and crying. Tr. 2139.

{¶53} Emily denied that Corey was isolated from the family. Tr. 2139. She identified Ex. ZZ as a video of Christmas which showed Corey getting presents and Hawkey sweeping the floor in the background. Tr. 2140-42. Emily denied that Corey did all of the chores, and testified that she and Corey each did chores and they would switch from day to day as to who had to do what. Tr. 2142. Emily testified that she had previously had a good relationship with Corey. Tr. 2143. She claimed that there was a feud with the neighbors and the boys would knock her off her bike, so Corey would then knock them off their bikes in

retaliation. Tr. 2143. She identified Ex. AAA as a video the neighbors made, which showed Corey riding his own bike. Tr. 2147-49. Emily then identified numerous exhibits as pictures representative of her childhood with Corey. Tr. 2150-86. The numerous pictures showed Corey riding his dirt bike, the two of them riding on a go-kart that Hawkey had bought them, Corey and Garrett at the fair, all of them at Castaway Bay, at the zoo, and playing on the reservoir. She identified pictures of herself and Corey playing dress-up in her room, and numerous pictures of Corey without a shirt. Emily testified that at Christmas, Corey either got numerous presents like her and Garrett or they got something big, such as a four-wheeler. Tr. 2159. Emily also identified pictures of Corey with numerous other extended family members. She identified one photo of Corey in a school play and one of him wearing short sleeves in a school photo. Emily testified that Corey always ate with the family, and that he ate not only his food, but whatever she did not eat. Tr. 2180. Emily denied that Corey ate in the laundry room. Tr. 2180. Emily testified that she and Corey went trick or treating together and identified numerous photos of Corey wearing shorts and no shirt. Tr. 2183. Emily also identified pictures of Corey eating and photos of Corey in his bedroom. Tr. 2186. According to Emily, their childhood was good and included them working and playing together. Tr. 2187-88.

{¶54} On cross-examination, Emily testified that Hawkey had told her that the gun fell off and the dog hit it causing it to fire and kill Robert. Tr. 2203. Emily read in the paper that it was a hunting accident. Tr. 2203. Emily admitted that she was not cooperative with the FBI interviewer, but claimed it was because she was angry, she had asked for an attorney, and the interviewer did not get her one. Tr. 2204, 2225. Emily testified that Robert had always told her never to answer questions from law enforcement or sign any papers they give you without talking to a lawyer. Tr. 2206. Emily admitted that she told the FBI that she was concerned about Hawkey's health and that Hawkey had liver cancer and was sick a lot. Tr. 2209. Emily also admitted that she spoke with Hawkey about her testimony, but denied that she was only saying what Hawkey told her to say. Tr. 2212. Emily admitted that Hawkey tries to control where she goes and monitors the car. Tr. 2213-14, 2222. Emily explained this control by stating that since the car belongs to Hawkey and Gary and she is living in their house, she has to follow their rules. Tr. 2213-14, 2222. Emily admitted that she told the FBI that Corey was "nothing but trouble" and that she was angry at Corey for just walking out of the family. Tr. 2225. Emily admitted that she does have an issue with anger and will sometimes hit a table or wall, but denied regularly striking other people. Tr. 2247. She admitted that she had struck Corey in a fight, but that he had fought too and it was just a sibling dispute. Tr. 2259. She also admitted that Corey

frequently did her homework, but denied that Hawkey made him do it. Tr. 2252. According to Emily, she and Corey had always gotten along. Tr. 2258.

{¶55} On redirect, Emily testified that Hawkey had gallbladder surgery and was very ill before then. Tr. 2271. She also testified that she was home and upset the day Hawkey was arrested at the home and that she was then taken to speak to the FBI and she did not want to do so. Tr. 2275-76. She did not know what was happening, only that her mother was arrested and that Garrett had been taken from the school. Tr. 2275-76. Emily testified that cancer runs in their family, so they are always concerned about it. Tr. 2277. She also testified that it had been difficult to interact with Hawkey while she was in jail and that they have argued many times as Hawkey tries to parent from the jail. Tr. 2277.

{¶56} The last witness for Hawkey was her husband Gary. Gary testified that he married Hawkey in October of 2010 and that Corey had lived with them for almost a year. Tr. 2285. During that time, he never saw Hawkey abuse Corey. Tr. 2286. Gary testified that on one occasion, he came in the house to see Corey holding Hawkey against the wall with a smile on his face. Tr. 2286. When Corey saw Gary, he stopped smiling and let Hawkey go. Tr. 2286. Hawkey appeared upset and did not want to talk about it. Tr. 2286. Corey walked into the living room and started watching television. Tr. 2286. When Gary questioned him about it, he just got up and walked out. Tr. 2286. Gary testified that on one occasion,

Hawkey had put ibuprofen in his coffee and he did not know it. Tr. 2287. On another occasion, she had put an energy drink in his coffee, but he spit it out when he tasted it. Tr. 2287. He claimed that the energy drink was added because he had been tired. Tr. 2287. Gary testified that Hawkey was a good mother, but was very outspoken and would tell the kids if she thought they were wrong. Tr. 2288. Gary denied that he increased his life insurance at Hawkey's request, instead stating that he did it because he could get increased insurance from $75,000 to $100,000 at the same cost. Tr. 2289-90. Gary testified that Hawkey had never tried to poison him, he had never been ill since getting married, and he had not missed any work since he had been married. Tr. 2291. According to Gary, his relationship with Corey was distant and he found Corey to be "kind of a smart a**". Tr. 2291. Gary testified that Corey did not like him and was critical of Gary because he kept old stuff instead of always buying new items. Tr. 2291-92. While Corey lived with them, Gary was concerned that he was using drugs because he frequently had glassy eyes. Tr. 2292. Gary testified that Hawkey had denied doing what Corey claimed and did not understand why he was making the claims. Tr. 2294. While living in the house with Corey, Gary saw no indication that any abuse of Corey was occurring. Tr. 2295.

{¶57} On cross-examination, Gary testified that he had married Judy a few months after the death of his first wife. Tr. 2296. Gary admitted that there was

conflict between his children and Hawkey, but denied that Hawkey was trying to keep him away from his children. Tr. 2297 Gary blamed his first wife's family for the conflict because they were not happy he was getting remarried so soon. Tr. 2297-98. After he married Hawkey, there was property damage around the house and to his vehicle. Tr. 2307-08. Gary believed that Corey was the one who had done the damage. Tr. 2308. The State asked Gary if he had seen evidence that Garrett was the one causing the damage, but Gary stated he had not seen that evidence. Tr. 2308.

{¶58} On rebuttal, the State put on evidence to show that Emily was not given a reading assignment to read "A Child Called 'It'" by Mrs. Leis as Emily had stated. Tr. 2363. However, Mrs. Leis was Emily's math teacher, so did not give any reading assignment and had no knowledge as to what assignments the English teacher gave. Tr. 2364. Additionally, the State presented evidence from a library technician that neither Emily nor Corey had checked out "A Child Called 'It'" from one school library between 2004 and 2008. Tr. 2370. The technician could not testify to any records after 2008 or for the libraries of the other school that Corey and Emily had attended. Tr. 2372. She also could not say whether Corey had ever read the book. Tr. 2373.

*Hearsay Testimony*

**{¶59}** The third assignment of error raises the issue of the introduction of hearsay evidence. "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St. 3d 269, 271, 569 N.E.2d 1056 (1991). An appellate court's review of the admission of evidence is limited to a determination as to whether the trial court abused its discretion. *Id.* "An abuse of discretion connotes more than a mere error in judgment, it implies that the trial court's decision was arbitrary, unreasonable, or unconscionable." *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, ¶ 22.

**{¶60}** Hawkey claims that the trial court erred by allowing Beck and Salter to testify to what Corey told them. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible unless there is an exception listed by the rules. Evid.R. 802.

*Testimony of Lauren Beck*

**{¶61}** Beck was permitted to testify to Corey's statements at a ballgame in 2012 about what happened in 2003 pursuant to the excited utterance exception to

the hearsay rule. Hawkey claims that this was too far removed in time to qualify as an excited utterance.

**{¶62}** An excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2).

> **The exception derives its guaranty of trustworthiness from the fact the declarant is under such a state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated. 2 McCormick, Evidence (5th Ed. 1999), Section 272.**
>
> **It may generally be said that the trial court must focus on the declarant's state of mind at the time the statement was made and that the shock of the event must be present at the time in order for the hearsay exception to apply. McCormick has observed that where a time interval between the event and the statement is long enough to permit reflective thought, the statements will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. 2 McCormick at 207, Section 272.**

*State v. Harr*, 158 Ohio App.3d 704, 2004-Ohio-5771, 821 N.E.2d 1058, ¶121-122 (2d Dist.).

**{¶63}** The Ohio Supreme Court set forth a four-part test for determining whether a statement falls within the excited utterance exception in *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955).[5] In *Potter*, the court held as follows:

---

[5] This same test was recently reiterated by the Ohio Supreme Court in *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948.

**Our conclusion is that hearsay testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over declarant's reflective faculties so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.**

*Id*. at 500-501. In reaching this conclusion, the Court held that the utterance must have occurred before the declarant had time to contrive the statement and misrepresent the facts. *Id*. at 496 (citing 6 Wigmore on Evidence (3 Ed.), 142, 155, Section 1749). However, the Court also required that there be flexibility in the determination of the length of time permitted under the exception. *Id*.

{¶64} In *State v. Duncan*, the Ohio Supreme Court addressed whether a statement by a six-year-old girl made two hours after the incident counted as an excited utterance. *State v. Duncan*, 53 Ohio St.2d 215, 373 N.E.2d 1234 (1978). The mother found the girl shaking violently and emerging from a closet. Upon questioning the child described being sexually abused by her step-father. The

Court allowed the child's statements to the mother to be admitted noting that the child had related the incident at the earliest possible time and there was no indication that the child had engaged in reflective thought. *Id*. at 221. Similarly in *State v. Wallace,* the Ohio Supreme Court held that a child's statements made 15 hours after she was attacked were admissible as the child had been drifting in and out of consciousness. *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466 (1988). "A period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited utterance exception to the hearsay rule." *Id*. at 90.

{¶65} In *State v. Boston*, the Ohio Supreme Court addressed whether the statements of a two-and-one-half-year-old child to her mother that were made several hours after the alleged assault occurred were admissible under the excited utterance exception to the hearsay rule. *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989). The Court determined that given the facts of the case before it, including the shocking nature of the assault and the age of the declarant, it was reasonable for the trial court to determine that the child was still in a state of excitement when she made the statement. *Id*. at 118. The Court held that since the child had reported the incident at the earliest opportunity and the record

contained no evidence to show that the child had engaged in reflective thought in the intervening time period, the evidence was admissible. *Id*.

{¶66} In *State v. Taylor*, the Ohio Supreme Court addressed directly the timeliness requirement for a statement to be admissible pursuant to the excited utterance exception to the hearsay rule. *State v. Taylor*, 66 Ohio St.3d 295, 612 N.E.2d 316 (1993). In *Taylor* the trial court admitted the testimony of a witness as to statements made by the victim to the witness. The statements concerned a threat to kill the victim by the defendant, which had been made the night before the victim told the witness about it. The Court in *Taylor* quoted Weissenberger's Ohio Evidence as stating

> **Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense. Accordingly, Rule 803(2) assumes that excited utterances are not flawed by lapses of memory or risks of insincerity."**

*Id.* at 300 (quoting Weissenberger's Ohio Evidence (1992), Section 803.16). The Court held as follows.

> **There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought.**
>
> **Therefore the passage of time between the statement and the event is relevant but not dispositive of the question. "[E]ach case**

**must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.**

*Id*. at 303. The testimony in *Taylor* was that the declarant was upset. However, "[m]erely being 'upset' clearly does not meet the standard for admissibility under Evid.R. 803(2) because it does not show that [the victim's] statements were not the result of reflective thought." *Id*.

{¶67} The facts in this case indicate that Corey was making his statements to Beck concerning the shooting of Robert almost nine years after the incident. Likewise, the abuse allegedly suffered at the hands of Hawkey ended when Corey moved out of the house in May of 2011. Thus, the conversation between Beck and Corey was occurring ten months after the incident which may have been considered abuse. Beck testified that Corey was very upset and because of his being upset, the trial court allowed the testimony to enter as an excited utterance. However, the trial court did not consider whether there had been time for Corey to calm down and reflect on what had happened. The facts in this case are that Corey had nine years to reflect on the shooting of Robert. When he was taken to the Coping Clinic due to his threatened suicide, he was upset as well, yet he still claimed the shooting was accidental. What would make the statements in 2012 while upset more reliable than the statements made in 2011 while also upset? Even if the stress could be said to continue while Corey remained in the household

and was subject to Hawkey's abuse, he had been out of that house for almost a year and had already disclosed to doctors that he had been abused. The evidence was that Corey had been treated for depression after he left the home and was living on his own. During that time he disclosed to the doctors the abuse and could have disclosed the shooting, but he did not do so. This court does not find that in the nearly ten years since the shooting of Robert, Corey had no time to reflect on what had happened. While there is no set time limit pursuant to the rule, the passage of nearly a decade, along with the specific facts of this case indicate that there was a break between the excitement of the incident and the disclosure. Thus Corey's statements lack the indicia of reliability required for admission pursuant to the excited utterance exception. Beck should not have been permitted to testify as to what Corey told her almost a decade after the incident since Corey had time to calm down and reflect on the situation. Thus, the trial court erred in admitting the testimony of Beck as to this issue.

{¶68} In order for the admission of hearsay evidence to result in a reversal of the conviction, there must be a showing of prejudice. *State v. Deanda*, 3d. Dist. Seneca No. 13-10-23, 2014-Ohio-3668, ¶39, 17 N.E.3d 1232. "Hearsay statements admitted that are repetitious of admissible statements and are supported by overwhelming evidence are not prejudicial." *Id*. "Error is harmless if there is no reasonable probability that the evidence may have contributed to the

accused['s] conviction." *State v. Isham,* 12th Dist. Butler No. CA2013-07-124, 2014-Ohio-1689, ¶ 15. "In the final analysis, the evidence in favor of conviction, absent the hearsay, must be so overwhelming that the admission of those statements was harmless beyond a reasonable doubt." *State v. Brewer*, 8th Dist. Cuyahoga No. 87701, 2006-Ohio-6029, ¶ 11 (reversed on other grounds, 113 Ohio St.3d 375, 2007-Ohio-2079). In this case, the testimony of Beck was repeated later by Corey. However, the mere fact that a declarant later testifies does not make the error harmless automatically. *State v. Montaz-Pagan,* 11th Dist. Trumbull No. 91-T-4635, 1994 WL 321598 (June 30, 1994). It is reversible error to allow repetitive hearsay statements of witnesses to bolster the victim's testimony. *State v. Haney*, 10th Dist. Franklin No. 87AP-561, 1987 WL 6308 (Dec. 3, 1987).

{¶69} A review of all the evidence presented in this case shows that this was not a clear case of guilt of Hawkey and the evidence was not overwhelming. The photos of the scene of the shooting show clearly that the original story told by Corey to the police was not supported by the physical evidence. There is no doubt that Robert was not sitting up in the bed talking to Corey when he was shot as the photos show no blood splatter on the wall and pooling of the blood in one spot, which indicates that Robert's body was not moved from the time of the shooting until the photos were taken. There was also stippling around the wound which

-57-

indicated that the shot was at close range. The pictures showed that the blankets were not disturbed and the body had not been moved, which belied the original claim that Corey had attempted to perform CPR. The gun, which Corey claimed to have dropped immediately after it accidentally went off was on the opposite side of the bed from the wound indicating that it was not immediately dropped. The officers and the EMT's indicated that they had concerns about the scene at the time, but they believed the story told by the then ten year old boy. The shooting was ruled an accident based solely upon Corey's statements to the police despite the contradictory physical evidence.

{¶70} Nine years later, Corey changes his story and indicates for the first time that the shooting was intentional and that he did it because he was forced to do so by Hawkey. All of the evidence is based upon the statements of one person, Corey. All of the conclusions reached by the professionals and the authorities were based upon what Corey told them. The only physical evidence to support Corey's claims of abuse are a scar, the origin of which is solely based upon Corey's statements, and the memories of two teachers that they saw bruising on one occasion on Corey. However, the bruising was not so severe as to make them report it to any authorities. Additionally, Corey's statements to the various investigators and doctors contained inconsistencies and Salter admitted to using leading questions during her interviews. The medical records of Corey do not

indicate that there were any signs of abuse. Additionally, the witnesses who interacted with Corey and Hawkey on a regular basis denied ever seeing any physical abuse, including the witnesses called by the State. The photos introduced as exhibits showed Corey throughout his childhood engaged in activities with the family and showing no indications of abuse or isolation.

{¶71} Outside of Corey's testimony, there was little evidence offered to prove that Hawkey committed child endangerment, which was the theory predicating the murder charge. There was no testimony by anyone that they actually witnessed any physical abuse of Corey by Hawkey. The only physical evidence was a small scar, which Knox could not definitively state was a result of abuse. Additionally, nearly all of the evidence suggesting that Corey was emotionally or psychologically abused by Hawkey was based upon his own statements, not observations of others. Rebber did testify that Corey was not allowed to have friends over and was forced to do all the chores. This evidence was contradicted by Forester who testified that Corey played with her own children all the time and that chores were performed by both Corey and Emily. Although a jury could choose what evidence to believe, the evidence of guilt cannot be said to be overwhelming. Given that the dispositive issue in this case was credibility, the effect of allowing the hearsay testimony of Beck was to bolster Corey's credibility. Thus, it cannot be said to have had no contribution to the

convictions. The error was therefore prejudicial and is the basis for the granting of a new trial.

*Dr. Ann Salter's Testimony*

{¶72} Hawkey also challenges the admission of Salter's testimony as to what Corey told her on the grounds that those statements were hearsay. This court initially notes that during the direct examination of Salter, there were very few statements as to what Corey told her and there were no details. The State argues in its brief that the statements were admissible as statements made for the purpose of medical treatment. However, the evidence was that the State hired Salter to interview Corey to confirm aspects of his story. Corey was not sent to meet with Salter for the purpose of treatment. In fact, Salter testified that she does not treat patients, but rather specializes in researching child abuse and violent crimes. Tr. 1502-1505. Since Corey was not seeking treatment, but was seeing Salter merely as part of the investigation, the medical exception to hearsay is not applicable.

{¶73} Next, the State argues that Salter's testimony as to what Corey stated was not offered for the truth of the matter, but rather to show why she reached the conclusions she did. The statements that Salter made concerning what Corey told her were as follows:

> **A.  * * * And when [Corey] described his life all through it, he talked about beatings and other forms of child abuse by [Hawkey].**

**Q. Did he talk to you or did you – did he talk to you about his concerns, his fears, where he's at now based upon what had happened to him?**

**A. Yes. He said, one thing he said was that he, if he saw someone who even reassembled [sic] her, his heart raced and he said, I believe, he would stop breathing and that he was still afraid of her.**

**\* \* \***

**Q. Were Corey's disclosures to you about some of the physical things important in your conclusions that you reached and, specifically, did he talk to you about eating feces, dog poop, or human feces?**

**A. Yes, he did.**

**Q. Did he talk to you about being made to rub something all over himself?**

**A. Yes, sir. Feces all over himself is what he talked to me about.**

**\* \* \***

**Q. And did Corey talk to you and give you examples that would be consistent with what the neighbor said they [sic] saw as far as what Corey told you that he had to do?**

**\* \* \***

**A. Okay. Yes, Corey described being isolated from other children and made to work all the time. And various people, ex-boyfriend, I believe, a neighbor --**

Tr. 1487-93. At the time this testimony was given, the State did not expect to call

Corey to testify. Tr. 1423. Thus any statements Salter made as to what Corey

stated would be hearsay. The statements made by the investigators and doctors as to what Corey told them were the only evidence before the trial court that supported Hawkey's involvement in a murder or child endangerment. The trial court noted to the State that if it excluded the interviews, as it did, there was "very, very limited evidence that gets to the jury." Tr. 1733. Clearly at that time, the State was hoping that the jury would take the statements as fact and rely on them to convict. As discussed above, the evidence supporting the convictions was not overwhelming in this case. Therefore, Hawkey was prejudiced by the admission of the hearsay statements. The third assignment of error is sustained.

*Testimony of Expert Witness Regarding "Child Torture"*

{¶74} The fourth assignment of error, Hawkey claims that the trial court erred by overruling the *Daubert* motion and allowing Knox to testify concerning child torture as a form of child abuse. When determining whether an expert's testimony is proper, Evidence Rule 602 sets forth the requirements.

**A witness may testify as an expert if all of the following apply:**

**(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;**

**(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.**

**(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that**

> **the testimony reports the results of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:**
>
> **(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;**
>
> **(2) The design of the procedure, test, or experiment reliably implements the theory;**
>
> **(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.**

Evid.R. 702. "Additionally, to be admissible, the expert testimony must assist the trier of fact in determining a fact issue or understanding the evidence." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 1998-Ohio-178, 687 N.E.2d 735.

> **In [*Daubert, supra*], the United States Supreme Court discussed the question of when expert scientific testimony is relevant and reliable. In *Daubert*, the court was faced with the issue of whether certain scientific evidence was admissible in a birth defects case. The trial court, in excluding the expert testimony, relied upon *Frye v. United States* * * *, which held that an expert's opinion is inadmissible unless it has gained "general acceptance" in the relevant scientific community. * * * The *Daubert* court expressly rejected this argument and reversed the granting of summary judgment. Instead, it held under Fed.R. Evid. 702, that expert scientific testimony is admissible if it is reliable and relevant to the task at hand. * * * To determine reliability, the *Daubert* court stated that a court must assess whether the reasoning of methodology underlying the testimony is scientifically valid. * * * In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. * * * Although these factors may aid**

> **in determining reliability, the inquiry is flexible.  * * * The focus is "solely on principles and methodology, not on the conclusions that they generate."  * * ***

*Miller, supra* at 611-612 (citations omitted).

{¶75} In this case, Knox testified that Corey was a victim of child torture as the form of child abuse.  Hawkey challenged this testimony as not being generally accepted in the scientific community.  A *Daubert* hearing was held on October 9, 2013.  Doc. 124.  At the hearing, Knox testified that the elements of "child torture" include various forms of abuse.  Child torture is the repeating of the abuse over time.  Hearing Tr. 67.  Knox admitted that she has created the definition of child torture and it has been submitted for publication, but it was not yet an accepted, formal medical definition.  *Id*. at 68.  Hawkey argues that since this diagnosis is not one accepted by the medical community and has yet to be subject to peer review, Knox's testimony diagnosing Corey as a victim of child torture should not have been admitted.

{¶76} The admissibility of an expert's testimony is within the sound discretion of the trial court and will not be reversed absent a showing that the trial court abused its discretion.  *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9.

> **"Abuse of discretion" suggests unreasonableness, arbitrariness, or unconscionability.  Without those elements, it is not the role of this court to substitute its judgment for that of the trial court.**

*Id.* Here, there is no doubt that the actual diagnosis of "child torture" had not been accepted by the scientific community at the time of trial as Knox testified to this fact. Additionally, the diagnosis of "child torture" had only been submitted for publication at the time of trial and had not been subject to peer review. No information was provided as to how the theory could be objectively applied. Instead, Knox merely testified that it was a diagnosis that she had created based upon her opinion and that she believed it would be accepted by the scientific community. This is not sufficient to meet the requirements of *Daubert*. Thus, the trial court erred by permitting Knox to testify that Corey was a victim of "child torture" and the fourth assignment of error is sustained.

### *Sufficiency of the Evidence*

{¶77} In the first assignment of error, Hawkey challenges whether the verdicts are supported by sufficient evidence and whether they are against the manifest weight of the evidence. A claim of sufficiency of the evidence raises a due process question concerning whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶219, 954 N.E.2d 596 (citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541). "On review of the sufficiency of the evidence to support a criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶34, 840 N.E.2d 1032 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560).

{¶78} Hawkey was indicted on six counts: one count of aggravated murder, four counts of endangering children and one count of insurance fraud. The counts of aggravated murder and insurance fraud were based upon the conduct making up the charges of endangering children, so they will be discussed after the four endangering children counts. The second count of the indictment alleged that at some time between January 1, 2000 to December 31, 2003, Hawkey had recklessly tortured or cruelly abused Corey in violation of R.C. 2919.22(B)(2). Doc. 1. This charge was based upon the allegation that Hawkey had threatened to cut off Corey's penis with a knife and caused serious physical harm to Corey by cutting him in the pubic region, thus leaving a permanent scar. Doc. 35. Corey testified that Hawkey had put a butter knife above his penis and told him she was going to make him a girl. Corey then indicated that Hawkey had accidentally cut him with that knife and that injury had left a scar. The jury was shown a picture of the remaining scar. Corey also testified that Robert had walked into the room immediately afterward, thus showing that it occurred before his death in November of 2003. Although Hawkey may not have intentionally cut Corey, she was acting in a manner which a reasonable juror could find to be reckless and she

was threatening severe harm to Corey. Viewing the evidence in the record of this matter in a light most favorable to the State, there was sufficient evidence from which a jury could determine that Hawkey had recklessly caused him serious physical injury. A reasonable juror could also determine that the threat to cut off Corey's penis while holding a knife above it was emotionally abusive. Thus, the evidence in this matter was not insufficient to have supported a conviction.

**{¶79}** The third count of the indictment alleged that between January 1, 2000, and December 31, 2003, Hawkey recklessly tortured or cruelly abused Corey in violation of R.C. 2919.22(B)(2). Doc. 1. This charge was based upon the allegation that Hawkey would partially fill a bathtub with ice cold water, force Corey to sit in it, and then repeatedly force his head under the water. Doc. 35. Corey testified that he "was forced to lay in ice water."[6] Tr. 1773. Viewing the evidence in the record of this matter in a light most favorable to the State, a reasonable juror could find that this was cruel treatment of Corey. The evidence in this matter was not insufficient to have supported a conviction.

**{¶80}** The fourth count of the indictment alleged that between January 1, 2000, and December 31, 2003, Hawkey recklessly tortured or cruelly abused Corey in violation of R.C. 2919.22(B)(2). Doc. 1. The count was based upon the claim that Corey was forced to eat excrement. Doc. 35. Corey testified that

---

[6] Corey did not testify at trial that Hawkey forced his head under the water, though others testified that he had told them about that activity occurring.

Hawkey would "force [him] to eat dog food and dog fecal matter." Tr. 1774. Corey alleged that this occurred sometime when he was in the first, second, or third grade. Tr. 1774. Viewing the evidence in the record of this matter in a light most favorable to the State, a reasonable juror could find that this was cruel treatment of Corey. The evidence in this matter was not insufficient to have supported a conviction.

{¶81} The fifth count of the indictment also set forth a charge of child endangerment during the same time frame and in violation of R.C. 2919.22(B)(2). Doc. 1. This count was based upon the allegation that Hawkey recklessly tortured or abused Corey by exposing his genitals to a flame to cause extreme pain, but removing the flame before any permanent damage occurred. Doc. 35. Corey testified that before second grade, he was beat daily and was covered in bruises. However, after teachers started asking questions, Hawkey switched to beating his genitals and burning them with a lighter. Corey testified that Hawkey "would pull [his] genitals and burn it with a lighter." Tr. 1775. Corey indicated that this happened regularly for many years. Tr. 1776-77. Given this testimony and viewing it in a light most favorable to the State, a reasonable juror could conclude that Hawkey had cruelly abused Corey. Thus, the evidence in this matter was not insufficient to have supported a conviction.

{¶82} The first charge was aggravated murder in violation of R.C. 2903.01(A). Doc. 1. The State alleged that Hawkey compelled Corey through the use of physical, psychological, and emotional abuse and torturous maltreatment to shoot Robert. Doc. 35. Corey testified at trial that he shot his father because Hawkey told him to do so and that he was terrified of Hawkey. Corey also testified that Hawkey told him what to do and laid out the gun for him. Tr. 1779. According to Corey, Hawkey told him that if he did not kill Robert, she would kill Corey. Tr. 1785. Corey testified how Hawkey had repeatedly abused him over the years. Knox and Salter testified as to how this abuse would affect his mental state and how it could result in him being coerced into shooting Robert. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Hawkey compelled Corey to shoot Robert through years of abuse. The evidence in this matter was not insufficient to have supported a conviction.

{¶83} Finally, Hawkey was charged with one count of insurance fraud in violation of R.C. 2913.47(B)(1). Doc. 1. This count was based upon the fact that Hawkey had completed the insurance forms claiming that the death was accidental while knowing it was not and had received over $150,000 as a result. Doc. 35. Reeve testified that the day after Robert's death, Hawkey came to the office and completed the paperwork to receive the death benefits. The amount of those benefits exceeded $300,000. Reeve also testified that Hawkey had indicated on

the forms that the death was accidental and identified the forms showing such as exhibits. Once the jury determined that the death was not accidental and that Hawkey was responsible for the death, it could reasonably determine that Hawkey had intentionally misstated the cause of death on the paperwork and had collected insurance proceeds as a result. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Hawkey had committed insurance fraud. The evidence in this matter was not insufficient to have supported a conviction.

*Manifest Weight of the Evidence*

Hawkey also challenges that the verdicts were against the manifest weight of the evidence. Having determined that the trial court erred to the prejudice of Hawkey by admitting hearsay testimony and allowing Knox to testify to "child torture", a new trial is mandated. Thus, the manifest weight claims are rendered moot and will not be addressed by this court. App.R. 12(A)(1)(c) and *State v. Platfoot*, 183 Ohio App.3d 349, 2009-Ohio-3769, 916 N.E.2d 1147 (2d Dist.). The first assignment of error is affirmed as to the sufficiency of the evidence as presented herein.

*Re-opening of the State's Case in Chief*

Hawkey claims in the second assignment of error that the trial court erred in allowing the State to reopen its case after it rested to introduce the testimony of

Corey. This assignment of error addresses a procedural issue that occurred in the first trial. As this court has determined that Hawkey is entitled to a new trial, this issue is rendered moot and will not be addressed by this court. App.R. 12(A)(1)(c).

{¶84} Having found prejudicial errors in the particulars assigned and argued, the judgment of the Court of Common Pleas of Defiance County is reversed in part and affirmed in part. The matter is remanded to the trial court for further proceedings in accord with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part,*
*And Remanded for Further Proceedings*

**ROGERS, P.J. concurs.**

**PRESTON, J., concurs in Judgment Only.**

**/hlo**