[Cite as *State v. Stein*, 2018-Ohio-2621.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
LOGAN COUNTY

STATE OF OHIO,

        CASE NO. 8-17-39

    PLAINTIFF-APPELLEE,

    v.

SCOTT A. STEIN,        O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR16-06-0170

Judgment Reversed and Cause Remanded

Date of Decision:  July 2, 2018

APPEARANCES:

    *Allen Vender* for Appellant

    *Eric C. Stewart* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Scott A. Stein ("Stein") brings this appeal from the judgment of the Court of Common Pleas of Logan County entering a judgment of guilt for one count of felonious assault and one count of improperly discharging a firearm. Stein challenges the convictions and claims he was denied the effective assistance of counsel. For the reasons set forth below, the judgment is reversed.

{¶2} On April 28, 2016, Stein, Brett Eley ("Eley"), and Krista Ashley ("Ashley") went to the home of Jason Davidson ("Davidson") to retrieve some property that had been stolen from Stein by Davidson and Eley. When they arrived, Eley and Ashley went to speak with Davidson, leaving Stein in the car. Eley spoke with Davidson while Ashley spoke with the owner of the home, Mike Volger ("Volger"). Ashley told Stein to come on up because Volger seemed nice. Stein came up to the house with a gun in hand. Volger told Stein that guns were not allowed on the property and then proceeded to tackle Stein to the ground. While Volger was fighting with Stein, Davidson came out of the house with a gun and fired at Stein multiple times, striking him in the leg and stomach. Stein then fired his gun towards Davidson. One of the bullets went into the home causing property damage. Eley and Ashley, who had run away when the shots were fired, came back and helped Stein get to the car. Stein eventually drove himself to the hospital where he was admitted and treated for his injuries.

{¶3} On June 14, 2016, the Logan County Grand Jury indicted Stein on three counts: 1) Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; 2) Improperly Discharging a Firearm into a Habitation in violation of R.C. 2923.161(A)(1), a felony of the second degree; and 3) Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Doc. 2. All of the counts contained a gun specification. *Id.* Stein was arraigned on July 18, 2016, and entered pleas of not guilty to all charges. Doc. 18. A jury trial was held on July 18 and 19, 2017. Doc. 133. At the trial, the following relevant testimony was presented. This court notes that the testimony of the witnesses is not consistent.

{¶4} Richard Seibert ("Seibert") testified that he was the manager of All Season Storage in Celina. Tr. 82. In April of 2016, he was notified that a storage unit had been broken into and damaged. Tr. 83. Seibert testified that Stein had not been authorized to store his car in the unit at the time it was damaged. Tr. 84. However, Seibert indicated that he did not report the damage to the police, but found out about it afterwards and did not see the unit until the next day. Tr. 87.

{¶5} Officer Brian Taylor ("Taylor") with the Celina Police Department testified that he received a complaint about a damaged storage unit on April 26, 2016. Tr. 89. When he went to the scene he observed that the handle had been broken, and that a portion of the door panel had been peeled back. Tr. 89. Although he could not get the door open, he was able to look inside the unit. Tr. 98. Inside the unit was a Ford Mustang that was identified as belonging to Stein. Tr. 90-91.

Later, Taylor learned that Stein had filed an insurance report about items stolen from inside the vehicle, although he had not filed a police report. Tr. 94

{¶6} Eley testified that he had known that Stein parked his car in the storage unit and that it contained some items that could be sold. Tr. 139. Eley testified that he knew Stein had parked the car with a laptop and with Viagra pills in it. Tr. 140. Eley also suspected there might be guns and possibly some drugs in the car. Tr. 140-41. Eley indicated that he told Davidson about the car and they made a plan to steal the items. Tr. 141. The night of the theft, Eley and Davidson went to the storage facilty. Tr. 141. Eley entered the code to the facility and Davidson broke into the unit. Tr. 142. They stole a laptop computer, the Viagra pills, a cell phone, and a shotgun from the vehicle, but no other drugs were found in the vehicle. Tr. 141-42. Eley and Davidson then took the items to Vogler's home and Eley left. Tr. 143. Eley testified that he received nothing for the theft and probably only did it with the expectation that Davidson would eventually give him some money to use to buy methamphetamines. Tr. 143.

{¶7} According to Eley, Stein figured out that Eley had to be involved in the theft and contacted him. Tr. 144. Stein made it clear that he wanted his stuff back and insisted that Eley would take him to get it. Tr. 144. Eley agreed to help him in order to avoid Stein calling the police. Tr. 144. Eley testified that he warned Stein that retrieving the property was a bad idea and that Davidson might shoot them. Tr. 145. Eley testified that Davidson would not "be bullied to give stuff back". Tr.

145. After picking up Ashley in Wapakoneta, Stein took them to his home in Celina to pick up a couple of handguns and to change vehicles. Tr. 146. They also picked up another guy identified as "Casey", who went with them to Indian Lake. Tr. 166. The four of them then went in Stein's car to Vogler's home in Indian Lake where Davidson was staying. Tr. 146.

{¶8} When they arrived at the home, Ashley and Eley went up to the home to speak with Davidson. Tr. 147. Stein waited in the car. Tr. 147. Not finding Davidson in the home, Eley and Ashley walked down to the lake where Davidson was fishing. Tr. 147. After a short discussion, Davidson refused to return the stolen items. Tr. 147. Davidson then left Eley and Ashley to return to the home. Tr. 148. Eley and Ashley followed, but when they arrived, Davidson only let Eley in the home, so Ashley remained outside. Tr. 148. While Eley was speaking to Davidson, he saw Stein walking to the door carrying a gun. Tr. 149. Vogler, who was on the porch with Ashley, then tackled Stein and began trying to take away the gun. Tr. 149. Eley testified that he did not hear any conversation before this. Tr. 149. Eley then heard a gunshot and took off running. Tr. 150. After the shots were finished, Eley heard Stein crying out in pain, so he went back to help. Tr. 152. Eley claimed that he saw Stein "on the ground shot up" and Davidson was telling him to get Stein out of there. Tr. 152. Eley then claims that he and Ashley got Stein into the car and drove off. Tr. 154. During the drive Stein was angry at Eley for getting him shot and pointed a gun at him, but it did not fire. Tr. 155. Eley testified that Ashley

pulled over and had Stein give her the gun, and she then gave the gun to Eley. Tr. 155. Ashley attempted to call 911, but her phone died, so they left the car to wait for the paramedics. Tr. 155-56. After a while, they walked back and found the car and Stein gone. Tr. 156.

{¶9} On cross-examination, Eley testified that he did not know what the outcome of going to confront Davidson was going to be. Tr. 165. He also testified that he did not know where Casey went after Eley went to speak to Davidson. Tr. 168. Eley admitted that Stein did not point the gun at anyone, that he was merely carrying it at his side. Tr. 173-74. Eley also indicated that after he saw Vogler charge Stein, he took off running. Tr. 174-75.

{¶10} Ashley testified that she met Eley for the first time the night of the shooting. Tr. 185. When Stein told her that he was going to retrieve his stolen items she decided to go along because she had been drinking and was bored. Tr. 186. They went to Stein's home to change vehicles, but she had not seen any weapons and did not know that there were any in the vehicle. Tr. 188. Ashley testified that Stein, Eley, Casey and she were in the car on the trip to Indian Lake. Tr. 188. During the drive, Stein was his normal self and was not angry in any way. Tr. 187. By the time they arrived, Stein was getting upset about being robbed, so Ashley told him to wait in the car while Eley and she went to speak with Davidson. Tr. 189. During the conversation with Davidson at the lake, Ashley told Davidson just to give the stuff back and he refused. Tr. 189. Davidson was mad and returned to the

home. Tr. 189. Ashley and Eley walked back to the house, where Eley went into the home to speak with Davidson some more. Tr. 190. Ashley was not welcome in the home, so she stayed outside and started speaking with Vogler. Tr. 190. During all of this time, Ashley had Stein on speaker phone, so he knew what was being said.

{¶11} While Ashley was speaking to Vogler, Stein came up the walk. Tr. 191. Ashley waived Stein over because Vogler was "nice". Tr. 191. Seeing Stein and the gun, Vogler pointed to a sign on the house which said "no guns" and then immediately tackled Stein. Tr. 192. Ashley testified that Stein's gun was pointed to the ground and that he never acted in a threatening manner. Tr. 192. No words were exchanged between Vogler and Stein. Tr. 193. Davidson then came out of the home with "a white hand towel wrapped around the gun and just started shooting at [Stein]". Tr. 193. At the first shot, Ashley retreated to the shed, but she could see what was happening. Tr. 193-94. Ashley testified that Davidson shot Stein 5-6 times. Tr. 194. She also testified that Stein may have accidentally fired his gun when he was tackled, but she did not believe he intentionally fired it. Tr. 194.

{¶12} When the shooting was over, Ashley came out of the shed and ran away. Tr. 194. She then went back because she could not leave Stein bleeding on the ground. Tr. 194. She convinced Eley to help her get him in the car so that they could take him to the hospital. Tr. 194. Once Stein was in the backseat of the car, they immediately left. Tr. 195. Stein tried to call 911, but his phone died. He then used her phone to call 911. Tr. 196. Ashley indicated that while in the backseat,

Stein was waiving a gun around, because he was panicking about being shot, but he did not threaten anyone in the car. Tr. 196-97. Ashley took the gun when Stein offered it and then handed it to Eley because she is afraid of guns. Tr. 196.

{¶13} On cross-examination Ashley again testified that Stein was not upset until they arrived at the home. Tr. 200. Because of this, she suggested he stay in the car so that they could avoid trouble. Tr. 201. Between the time they arrived and the time the shooting was over, only 20-30 minutes had passed. Tr. 203. Stein had not threatened anyone and was tackled before he could say or do anything. Tr. 206. Vogler was attempting to take Stein's gun away. Tr. 207. After the shooting, Davidson went back into the home and Vogler began picking things up. Tr. 209. Ashley also indicated that she took the gun from Stein in the car because he was waiving it around while panicking about being shot and she was afraid he might accidentally shoot them or himself. Tr. 211.

{¶14} Vogler testified that he owned the home where the shooting occurred and was the only one who lived there. Tr. 226. He had allowed Davidson to stay there because Davidson had been dating his daughter, though he did not like Davidson. Tr. 226. On the day of the shooting, Davidson showed up and went down to the docks to fish. Tr. 227. When Eley showed up with Ashley, Vogler was not surprised because Eley was a friend of Davidson. Tr. 227. Eley and Ashley came up to the home and knocked on the door. Tr. 229. Vogler told Eley and Ashley that Davidson was fishing, so they left and went to find him. Tr. 229. Ten

to fifteen minutes later, Davidson came back on the four-wheeler, jumped off, and ran inside the home. Tr. 230. Approximately five minutes later, Eley and Ashley returned. Tr. 230. Eley went inside, but Ashley stayed outside. Tr. 230-31. Vogler made small talk with her until he saw Stein come onto the porch. Tr. 231.

{¶15} Vogler testified that when he saw Stein, Stein's eyes were "bugged out of his head" and he was coming at them carrying a gun "that looks like an Uzi, definitely an automatic". Tr. 232. When Vogler asked him what was going on, Stein indicated that he was the one Eley and Davidson had robbed and started toward the front door. Tr. 232. Vogler testified that he then "went crazy" and charged Stein. Tr. 233. Vogler grabbed him around the face and grabbed Stein's wrist to try and get the gun. Tr. 233. Two shots were fired and his head was grazed twice. Vogler then grabbed the gun and it was fired randomly as he and Stein fought over it. Tr. 234. They ended up on the ground. Tr. 234. Then Davidson came out of the home and started "unloading on this fellow". Tr. 235. Although both Stein and Vogler were on the ground, Davidson was firing at them. Tr. 235. Vogler then got the gun and Stein punched him. Tr. 236. Vogler then struck Stein in the head with the gun. Tr. 236. According to Vogler, Davidson then came out and hit Stein in the head with the butt of his pistol. Tr. 236. Then Davidson and Eley both took off. Tr. 237. Stein was lying in a pool of blood with "two streams coming out his side that * * * just kept squirting probably three feet out." Tr. 237. Vogler then told Ashley to get Stein out of there because he did not want him dying there. Tr. 237.

Vogler then testified that he tossed Stein's weapon into the bushes by the home. Tr. 238.

{¶16} Vogler testified that he believed Stein's weapon had fired 15 shots, though only four casings were found. Tr. 240. Vogler also testified that he did not know where either Stein's or Davidson's guns ended up. Tr. 240-41. Although there was a shotgun in the home, it was not his. Tr. 242. According to Vogler, Davidson and Eley had brought the shotgun to the home. Tr. 242. A rifle was found on the neighbor's shed, which Vogler admitted that he had put it there before he left the home so that it would not be found in the home. Tr. 243.

{¶17} On cross-examination, Vogler admitted that Stein had not pointed the gun at anyone and that Vogler tackled him to the ground "pretty quick". Tr. 258. When Davidson left the home, he had his gun in his waistband and was heading toward the water. Tr. 252. Vogler admitted that he never called the police and that instead of staying and talking to the police, he took off to avoid questions. Tr. 262. Before he went, he removed all known weapons from the home so that he would not get in trouble for having a weapon under a disability. Tr. 264-67. Vogler also admitted that although he believes he was grazed by a bullet, he did not seek treatment or call the police because he wanted to avoid answering the questions of the police. Tr. 263.

{¶18} Davidson testified that he was fishing when Eley and Ashley found him to talk. Tr. 278. When Ashley told him to return the stolen items to Stein, he

informed them that he did not have the items. Tr. 278. Davidson then returned to the home on a four-wheeler. Tr. 279. He returned to the home because he thought that Eley and Ashley were hostile and because they had told him that Stein had a gun. Tr. 279. When Eley and Ashley came up to the house, Davidson allowed Eley to enter, but Ashley stayed on the porch with Vogler. Tr. 279. Davidson testified that he went and got one of the many guns Vogler had in the home because he was afraid of Stein. Tr. 280. According to Davidson, he was not involved in the robbery. Tr. 281. The items belonging to Stein were found at the home because Eley stole them and brought them to the home to sell to Vogler. Tr. 281. The items included a shotgun, a phone, and some Viagra pills. Tr. 280.

{¶19} While speaking to Eley, Davidson saw Stein walk by the home carrying a gun. Tr. 282. Davidson testified that he stood up and saw Vogler and Stein wrestling outside the home. Tr. 282. Davidson then stood up and fired a couple of rounds from inside the home at Stein's legs. Tr. 282. According to Davidson, no shots had been fired by Stein and Davidson was the first to fire a weapon. Tr. 282. After Davidson's shots, Stein fired back a couple of shots, which entered the home. Tr. 283. Davidson then fired two more shots. Tr. 283. Davidson testified that both he and Stein had each fired four shots. Tr. 284. After that, Vogler took the gun away from Stein. Tr. 284. Davidson testified that he went out and gave the gun he had to Vogler and took off. Tr. 284. To the best of his knowledge, Vogler had kept both guns. Tr. 284. Davidson denied that he had struck Stein with

a gun and indicated that Vogler had a minor scrape to his head, likely from wresting around with Stein on the patio. Tr. 284-85. Although Eley was in the home when Davidson first fired his gun, Eley had left by the time it was over. Tr. 285. Davidson testified that when he left, Ashley and Vogler were helping Stein up. Tr. 285. Davidson indicated that he left the scene because he did not want the police to know he had been around guns as this was prohibited. Tr. 286. He was arrested a couple of days later when he wrecked his car on the way to Dayton. Tr. 286-87.

{¶20} On cross-examination Davidson testified that he did not have anything to do with the robbery. Tr. 289. Eley committed the robbery and brought the items to Vogler to be fenced. Tr. 290. Davidson testified that he did not allow Ashley into the home because he did not know her. Tr. 293. He only went and got the pistol when he observed Stein and Vogler fighting. Tr. 294. Davidson admitted that he fired the initial two shots through the closed storm door and he did not know if any of the shots struck Stein. Tr. 297.

{¶21} Deputy Thomas Meek ("Meek") of the Logan County Sheriff's Department testified that on the night in question, he was sent to Vogler's home in response to shots fired. Tr. 101. While en route, he learned that a call had come into dispatch from a male indicating that he had been shot several times. Tr. 102. Another deputy was dispatched for that call. Tr. 102. When Meek arrived at the home, he saw blood on the ground, spent cartridges from a handgun, broken glass and bullet holes. Tr. 103. No one was present outside or inside the home. Tr. 103.

Multiple photos were taken of the scene. These photos showed where there had been "quite a bit of blood" on the ground. Tr. 105. Meek also saw multiple blood droppings. Tr. 107-109. Photos of the scene also showed multiple bullet holes in the walls and door of the home. Tr. 110-114. While at the scene, Meek was notified that Stein had been shot near Indian Lake and was then at the hospital for treatment. Tr. 116. Meek indicated that it was believed that Eley had been with Stein. Tr. 116. Around 1:30 a.m., Eley and Ashley were found outside of the Dollar General. Tr. 118-19. A pat down search for weapons was conducted and a .380 caliber gun and some drug contraband was found on Eley. Tr. 119-20. Eley was arrested, though both Ashley and Eley were transported to the station to answer some questions. Tr. 120-131. Meek was not able to speak with Vogler because he did not find him. Tr. 131.

{¶22} Sergeant Chris Green ("Green") of the St. Marys Police Department spoke with Stein briefly at the hospital. Tr. 217. Green testified that he could not get much information from Stein as he was "in and out" of consciousness, but Stein indicated that Eley was with him when he was shot. Tr. 217. He observed that there were bullet holes in Stein's jeans. Tr. 218. Green also observed large amounts of blood in both the back and front seat of the Stein's car. Tr. 219. A cell phone was lying on the backseat. Tr. 219. When Green arrived at the hospital, the doctors were working on Stein and Stein was in poor shape. Tr. 221.

{¶23} Detective Mike Brugler ("Brugler") of the Logan County Sheriff's Department testified that he obtained a search warrant for the home and collected evidence at the scene. Tr. 302-303. Although they only found eight cartridges, he believes they may have missed some. Tr. 314. When Brugler spoke to Stein in the hospital, Stein did not look good. Tr. 317. However, Brugler was able to interview him and the interview was recorded and played for the jury. On the recording, Stein indicated that he was shot eight times and had needed surgery on his stomach. Tr. 319. Stein also indicated that there was still a bullet in his leg which could not be removed. Tr. 319. Stein told Brugler about the robbery and stated that Eley had admitted that Eley and Davidson had shot the lock off the storage unit with a 45 and then pried up a panel to enter the unit. Tr. 321. Stein told Brugler that the two had broken the window in his car and stolen items. Tr. 321. Stein reported that a green, magnum shotgun with a pistol grip, a laptop computer, and some generic Viagra were taken from his car. Tr. 321-22.

{¶24} At the scene, Stein heard the conversation between Davidson, Eley and Ashley because Ashley had him on speakerphone. Tr. 323. When Stein heard Davidson refuse to return the items, he decided to go up to the home. Tr. 323. He came up towards the patio when Ashley told him to do so on the phone. Tr. 324. When he arrived at the home, an older man [Vogler] started hitting him and trying to knock him down. Tr. 323. Stein denied that he was angry and denied that he fired any shots. Tr. 328. Stein indicated that he only took the gun as personal

-14-

protection. Tr. 329. Stein says that while Vogler was trying to take the gun away from him, he was shot. Tr. 330. While Stein and Vogler struggled with the gun, he did not see Davidson and did not see who was shooting at him. Tr. 331. Stein admitted that he had taken a 9 millimeter gun, but told Brugler that Vogler had kept it. Tr. 332. According to Stein, he was still getting shot even after he was disarmed. Tr. 332. Stein told Brugler that he never physically pointed the gun at anyone and that the only reason he had taken it was because Eley had told him that it was dangerous to go there and that they would all get killed. Tr. 333-337. Brugler then told Stein that many items were found in the home that were believed to belong to Stein. Tr. 352.

{¶25} During the interview, Brugler also made the following statements to Stein.

> **Basically [Eley] described himself as a meth user. He says his relation – I'm not here about meth. Believe me. He describes himself as a meth user, and his relationship with you is he gets his meth off of you. He buys his meth off of you.**

Tr. 324. Brugler brought the conversation back to this issue at other times during the interview as well.

> **Detective: [Eley] basically buys his dope from you. He takes his – that dope and he'll sell some of that to these guys.**
>
> **Stein: I heard he gets his dope up there.**
>
> **Detective: Huh?**
>
> **Stein: I heard he gets his dope up there.**

\* \* \*

**Detective: Okay. Let's back up all the way here to your relationship with [Eley]. Do you believe [Eley] – I know you said – or he's telling you that he set it up, set up the – your storage unit getting hit. Do you believe he was more involved in that?**

**Stein: He might have – he was there.**

**Detective: Okay.**

**Stein: He was the only person that knew about it, but I don't know, you know. I didn't even think he would do anything like that.**

**Detective: Okay. How long have you known [Eley]?**

**Stein: I don't know, six months; five, six months.**

**Detective: Not very long then?**

**Stein: No.**

**Detective: He's never purchased meth off of you.**

**Stein: Huh-uh.**

**Detective: Do you know him to be a meth user?**

**Stein: He uses all kinds of drugs. He uses bath salts and you name it, he'll do it.**

**Detective: Okay, But as far as buying meth from you –**

**Stein: No. \* \* \***

\* \* \*

**Detective: Were you drinking that night?**

**Stein: I don't recall. I don't think so. I wasn't drinking (indiscernible).**

**Detective: Were you using meth that night?**

**Stein: No. I had no meth or anything in my system. \* \* \***

**\* \* \***

**Detective: \* \* \* But you didn't have any – smoke meth that night or anything like that?**

**Stein: No.**

**\* \* \***

**Detective: [Discussing why Stein had been fired from a job] Have anything to do with a drug test?**

**Stein: No.**

**Detective: Do you use meth?**

**Stein: No. I just had a girl with me on a trip and some crazy stuff happened and stuff and they let me go.**

**Detective: Okay. But do you like, use meth recreationally?**

**Stein: I don't even know where to find meth. That's like – this is Ohio, you know what I mean?**

**Detective: Okay.**

**Stein: So I used to years ago.**

**Detective: You smoked it before.**

**Stein: It wasn't the way – you know, I snorted it.**

**Detective: Snorted. Okay.**

> **Stein:  I grew up in California.  It's like –**
>
> **Detective:  It's big over there.**
>
> **Stein:  Yeah.**

Tr. 325; 334-35; 344-45; 347-48.  The interview was played in full before the jury.

{¶26} On cross-examination, Brugler admitted that he could not tell if all the bullet holes came from inside or outside of the home.  Tr. 355.  Brugler also admitted that while Stein was interviewed at the hospital, he was groggy.  Tr. 357.  Although they looked everyplace for the gun that Vogler claimed he tossed aside, it was never found.  Tr. 358.  Brugler believed that someone, most likely Vogler or Davidson, walked off with the gun.  Tr. 359.  The police also did not find the 45 fired by Davidson.  Tr. 359.  However, Brugler testified that they did find Stein's stolen shotgun in the home.  Tr. 359.

{¶27} Following the testimony, the State rested and voluntarily dismissed Count 3 of the indictment.  Stein presented no evidence.  At the conclusion of the trial, the jury returned verdicts of guilty as to counts one and two and the two gun specifications.  Doc. 126-129.  A sentencing hearing was held on September 14, 2017. Doc. 144.  The trial court ordered Stein to serve an aggregate prison term of six years.  *Id.*  Stein filed a timely notice of appeal.  Doc. 151.  On appeal, Stein raises the following assignments of error.

**First Assignment of Error**

**[Stein] received ineffective assistance of counsel because his attorney failed to object to inadmissible, and prejudicial hearsay and evidence of alleged bad acts.**

**Second Assignment of Error**

**[Stein] received ineffective assistance of counsel because his attorney failed to object to prosecutorial misconduct in closing argument[.]**

**Third Assignment of Error**

**The trial court violated [Stein's] rights to due process and a fair trial when it entered a judgment of conviction for felonious assault against the manifest weight of the evidence.**

**Fourth Assignment of Error**

**The cumulative effects of Stein's first [three] assignments of error denied him a fair trial.**

*Ineffective Assistance of Counsel*

{¶28} In the first two assignments of error, Stein claims that he was denied the effective assistance of counsel.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Hester* (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." *State v. Lytle***

> **(1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**
>
> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent.** *See Vaughn v. Maxwell* **(1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164;** *State v. Jackson*, **64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). "The failure to prove either 1) a substantial violation or 2) prejudice caused by the violation makes it unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca No. 13-15-42, 2016-Ohio-3499, ¶ 20.

**{¶29}** The first assignment of error alleges that counsel was ineffective for failing to object to statements of prior bad acts. The second assignment of error then claims that counsel was ineffective for not objecting when the State used those statements as support for its case in the rebuttal of closing argument. As the assignments of error are intertwined, we will address them together.

**{¶30}** One of the requirements for an ineffective assistance of counsel claim is that counsel made an error that substantially affected his duties. Stein claims that counsel should have objected to the admission of irrelevant evidence and hearsay evidence. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. "Evidence

of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith." Evid.R. 404(B).

{¶31} A review of the evidence shows that counsel failed to object to multiple instances of irrelevant evidence. Initially, the State brought in the testimony of Seibert to testify that Stein did not have the legal right to use the storage facility, and was thus stealing the use of the unit. Stein was not charged with a theft offense for the unauthorized use of the facility. Seibert was not able to testify as to what had been taken or even when the theft occurred as he was not the one who notified the police. The State argued at oral argument that Seibert's testimony was relevant to establish that the theft occurred in Mercer County. That information is not relevant to this case, as the offenses at issue occurred in Logan County. Additionally, Taylor testified as to the break-in at the storage unit and how he knew that the vehicle he observed belonged to Stein. Seibert's testimony served no real purpose other than to establish that Stein had committed a theft offense, which was not relevant to this case. Thus, this evidence was not admissible under the rules of evidence.

{¶32} The next series of instances of irrelevant evidence which was introduced at trial were the statements regarding the use and sale of illegal substances by Stein. These statements were made by Brugler during the interview, which was played to the jury. During the interview, Brugler repeatedly indicated that he believed that drugs were the motive for the shooting and implied that Stein

was dealing meth. Statements about the presence of illegal substances were also introduced by the State when it questioned Eley as to whether he expected to find illegal drugs in the car when they robbed it. Tr. 140-41. Stein was not charged with any drug offenses in this case. Additionally, there was no testimony that any illegal drugs were stolen. All of the testimony indicated that there were no illegal substances stolen from the vehicle and thus none to be retrieved. Eley specifically testified that although he and Davidson had hoped there would be illegal drugs in the car, there were none. Tr. 140-42. This testimony was not relevant because it did not make any fact of consequence, i.e. whether the firing of the gun was felonious assault or self-defense, more or less likely.

{¶33} Stein also argues that the statements of Brugler regarding Eley's statements were also hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). The statements in question were statements of Brugler made during the interview that Eley had told him that Stein was a drug dealer. These were out of court statements and do not meet one of the exceptions to make it admissible. The State argues that the statements were not hearsay because they were not offered for the truth of the matter asserted, i.e. that Stein was a drug dealer. However, this argument is not supported by the record. During the State's rebuttal of closing arguments, the State made the following

arguments to the jury while trying to give the jury a reason why Stein did not call the police to retrieve his stolen property.

> **You know, in his interview, we hear about – the other witnesses brought up this mysterious guy named Casey that was also in the car going down. They didn't tell the police about this Casey guy. Why aren't they – what else aren't they telling us? What else was in that backpack[1] that no one's talking about?**
>
> **Brett Eley gets caught with some meth in his pocket on the way down to Dayton – I'm sorry, Jason Davidson. Car crash, meth in his pocket, he's fleeing from Logan County. Brett Eley is a meth user. They asked him [Stein] twice in the interview, does he get his meth from you, Mr. Stein? First time he doesn't even respond. Second time he says no, he gets it from somebody else.**
>
> **So, why aren't they talking about this? Because a drug dealer cannot report that his drugs have been stolen. What we have here is a thug going back to get his property. Prudent, law-abiding citizens – his words – don't take guns over to people's property – go on to their property, threaten them with it intimidate them with it.**

Tr. 390-91. If the statements regarding Stein being a drug dealer were not being offered for the truth of the matter asserted and no other evidence exists that Stein was a drug dealer, the State cannot imply during closing arguments that Stein is a drug dealer. The statements were hearsay, did not meet an exception, and should have been excluded upon a proper objection by trial counsel.

{¶34} The State also argued that there was no prejudice from the statements because they were exculpatory to the defendant since he denied the accusation. If

---

[1] The backpack references the backpack stolen from Stein's vehicle by Eley and Davidson.

the statements were exculpatory, what basis did the State have to infer that Stein was a drug dealer?  As discussed above, there was no admissible evidence that Stein was dealing drugs because there were no charges involving drugs in this case.  Thus, this argument to the jury made by the State had no rational relationship to Stein's charges.  Given that irrelevant evidence of prior bad acts was admitted and improper statements by the State during closing argument focused on that evidence, counsel's performance was deficient by not objecting.

**{¶35}** Having found errors by counsel during trial, the next question is whether the errors were prejudicial.  A judgment of conviction shall not be reversed based upon the erroneous admission of evidence "unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby".  R.C. 2945.83(C).  "[T]he real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25.  To make this determination, an appellate court must focus on both the impact of the offending evidence on the verdict and the strength of the remaining evidence. *Id*.  The Ohio Supreme Court then stated three guiding principles:  1) was there prejudice; 2) can the appellate court state that "the error was not harmless beyond a reasonable doubt; and 3) does the remaining evidence provide overwhelming evidence of guilt. *Id*. at ¶ 27-29.  The Court noted that a new trial is necessary in cases where the appellate court cannot "find beyond a reasonable doubt that the improper evidence had no

effect" on the verdict. *Id.* at ¶30. The Court also held that the actions of the prosecutor "may combine with an evidentiary error to cause greater impact. *Id.* at ¶ 31. In the Morris case, the lower court had reversed the conviction not only because inflammatory evidence had been admitted into a case that was not strong, but also because the State had repeatedly referred to the evidence in closing argument. *Id.* at ¶30. The Ohio Supreme Court affirmed the appellate court's determination that in *Morris*, they could not find that the admission of prior bad acts did not affect the verdict and that without the statements, the defendant would have been found guilty beyond a reasonable doubt. *Id.* at ¶ 33.

{¶36} This case, like *Morris*, involves a case where evidence regarding other bad acts was admitted. "Under longstanding principles of Anglo–American jurisprudence, an accused cannot be convicted of one crime by proving he committed other crimes or is a bad person." *State v. Jamison*, 49 Ohio St.3d 182, 184, 552 N.E.2d 180 (1990). The State argued during closing arguments that Stein was not entitled to the self-defense verdict because he was a drug dealer who was going to retrieve his drugs. The State also referred to Stein as a thug. There was no evidence that any drugs were involved in this case. Stein was not charged with any drug related offenses and Eley testified there were no drugs stolen. Yet the State argued that there were and that Stein was a drug dealer. This argument may have caused the jury to regard Stein as a bad person who was more likely to be acting in accord with his criminal nature than one who was acting to protect his own life when

he fired his weapon. This court cannot find that this evidence and the argument of the State did not have an impact on the verdict. Additionally, the remainder of the evidence was not overwhelming when it comes to self-defense. The testimony was inconsistent as to what happened, how Stein was carrying the gun, and even who shot first. Davidson, who was the one who shot Stein, testified that he fired first and Stein returned fire after he had been shot. Given the inconsistency of the testimony, this court does not find that the jury could not have found that the affirmative defense of self-defense was applicable and that the verdict would be the same beyond a reasonable doubt. Therefore, we cannot find that the errors of counsel were harmless. The first and second assignments of error are therefore sustained.

{¶37} Having sustained the first two assignments of error, we now turn to the third and fourth assignments of error. The third assignment of error alleges that the conviction for felonious assault was against the manifest weight of the evidence. Having determined that counsel was ineffective for failing to object to hearsay evidence of prior bad acts and the State's argument using that evidence, thus denying Stein a fair trial, a new trial is mandated. Thus, the manifest weight claim is rendered moot and will not be addressed by this court. App.R. 12(A)(1)(c) and *State v. Hawkey*, 2016-Ohio-1292, 62 N.E.3d 721, ¶ 84 (3d Dist.). Likewise, the claim in the fourth assignment of error regarding the impact of cumulative errors is also rendered moot and will not be addressed by this court. App.R. 12(A)(1)(c).

-26-

{¶38} Having found prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Logan County is reversed and the matter is remanded for further proceedings in accord with this opinion.

***Judgment Reversed***
***And Cause Remanded***

**ZIMMERMAN and PRESTON, J.J., concur.**

**/hls**